1 | **VENABLE LLP**
2 | Shannon E. Beamer (SBN 331289)
  | Email:    sebeamer@venable.com
3 | Nicole N. King (SBN 290204)
  | Email:    nnking@venable.com
4 | 2049 Century Park East, Suite 2300
  | Los Angeles, CA  90067
5 | Telephone:   (310) 229-9900
  | Facsimile:   (310) 229-9901
6 |
7 | Attorneys for Defendants
  | MERCK & CO., INC.;
  | MERCK SHARP & DOHME CORP.;
8 | ORGANON & CO.; and ORGANON LLC

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| KATHERINE O'BRIEN, an individual, | CASE NO. |
|---|---|
| Plaintiff, | |
| v. | **DECLARATION OF NICOLE N. KING IN SUPPORT OF DEFENDANTS MERCK & CO., INC., MERCK SHARP & DOHME CORP., ORGANON & CO., AND ORGANON LLC'S (1) NOTICE OF REMOVAL AND REMOVAL OF ACTION AND (2) REQUEST FOR JUDICIAL NOTICE** |
| MERCK & CO., INC., a New Jersey Corporation; MERCK SHARP & DOHME CORP., a New Jersey Corporation; ORGANON & CO., a Delaware Corporation; ORGANON LLC, a Delaware Limited Liability Company; and DOES 1-10, inclusive, | |
| | [Ventura County Superior Court Case No. 56-2022-00563317-CU-PO-VTA] |
| Defendants. | |
| | Action Filed:     March 4, 2022 |
| | Action Removed: April 15, 2022 |
| | Trial Date:        None Set |

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

## DECLARATION OF NICOLE N. KING

I, Nicole N. King, hereby declare and state as follows:

1. I am an attorney licensed to practice law in California and am Counsel at Venable LLP, counsel of record for Defendants Merck & Co., Inc., Merck Sharp & Dohme Corp., Organon & Co., and Organon LLC (collectively, "Defendants"). I have personal knowledge of the matters stated below and, if called upon, could and would testify competently thereto.

2. This declaration is submitted in support of Defendants' Notice of Removal and Removal of Action and Request for Judicial Notice in Support of Defendants' Notice of Removal and Removal of Action.

3. Attached hereto as **Exhibit 1** is a true and correct copy of the Complaint, filed in the Superior Court of the State of California, County of Ventura, on or about March 4, 2022, captioned *Katherine O'Brien v. Merck & Co., Inc., et al.,* Ventura County Superior Court Case No. 56-2022-00563317-CU-PO-VTA, along with the Summons and Civil Case Cover Sheet.

4. On March 3, 2022, I viewed the electronic copy of the California Secretary of State's Statement of Information for Merck Sharp & Dohme Corp. I found this form by: (1) typing the following URL address into the California Secretary of State Business Search website into my search bar: https://businesssearch.sos.ca.gov/; (2) entering the company name "Merck Sharp & Dohme Corp." into the box labeled "Search Criteria;" (3) selecting the box labeled "Corporation Name;" (4) selecting the link labeled "Search;" and (5) selecting the second displayed link labeled "Merck Sharp & Dohme Corp."

5. Attached hereto as **Exhibit 2** is a true and correct copy of the California Secretary of State's Statement of Information for Merck Sharp & Dohme Corp., filed on December 20, 2021, that I accessed using the foregoing process. This document's ultimate electronic location is: https://businesssearch.sos.ca.gov/CBS/Detail.

6.     On March 7, 2022, I downloaded a PDF of the New Jersey Secretary of State's Entity Details for Merck & Co., Inc.  I found this form by: (1) typing the following URL address into the New Jersey Secretary of State Business Search website into my search bar:

https://www.njportal.com/DOR/businessrecords/Default.aspx; (2) selecting the link for "Business Entity Standing Certificates;" (3) selecting the link for "Business Name;" (4) entering the company name "Merck & Co., Inc." into the box labeled "Business Name;" (5) selecting the link labeled "Continue;" (6) selecting the first box under the heading "Short Form;" (7) adding the document to the cart; (8) purchasing the document; and (9) downloading the document using an access code.

7.     Attached hereto as **Exhibit 3** is a true and correct copy of the New Jersey Secretary of State's Business Entity Short Form Standing Certificate for Merck & Co., Inc., that I downloaded using the foregoing process.

8.     On March 7, 2022, I downloaded a PDF of the New Jersey Secretary of State's Status Report for Merck & Co., Inc.  I found this form by: (1) typing the following URL address into the New Jersey Secretary of State Business Search website into my search bar:

https://www.njportal.com/DOR/businessrecords/Default.aspx; (2) selecting the link for "Business Entity Status Reports;" (3) selecting the link for "Business Name;" (4) entering the company name "Merck & Co., Inc." into the box labeled "Business Name;" (5) selecting the link labeled "Continue;" (6) selecting the first box under the heading "Order Status Report;" (7) adding the document to the cart; (8) purchasing the document; and (9) downloading the document using an access code.

9.     Attached hereto as **Exhibit 4** is a true and correct copy of the New Jersey Secretary of State's Status Report for Merck & Co., Inc., that I downloaded using the foregoing process.

**V E N A B L E   L L P**
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

DECLARATION OF NICOLE N. KING

10.     On March 7, 2022, I requested a copy of the Delaware Division of Corporations Short Form Standing Certificate for Organon & Co.  I found this form by: (1) typing the following URL address into the Delaware Division of Corporations website into my search bar: https://icis.corp.delaware.gov/ecorp2/services/e-filing; (2) selecting the link for "certificate request;" (3) selecting the link for "Document Upload;" (4) entering certification request information for the company name "Organon & Co." into the box labeled "Corporation Name;" (5) selecting the method of return, "Fed Ex;" (6) selecting the link labeled "Continue;" (7) purchasing the document; and (8) receiving the document via Fed Ex delivery on March 9, 2022.

11.     Attached hereto as **Exhibit 5** is a true and correct copy of the Delaware Division of Corporations Short Form Standing Certificate for Organon & Co. that I received via Fed Ex using the foregoing process.

12.     On March 7, 2022, I downloaded a PDF of the New Jersey Secretary of State's Entity Details for Organon & Co.  I found this form by: (1) typing the following URL address into the New Jersey Secretary of State Business Search website into my search bar: https://www.njportal.com/DOR/businessrecords/Default.aspx; (2) selecting the link for "Business Entity Standing Certificates;" (3) selecting the link for "Business Name;" (4) entering the company name "Organon & Co." into the box labeled "Business Name;" (5) selecting the link labeled "Continue;" (6) selecting the first box under the heading "Short Form;" (7) adding the document to the cart; (8) purchasing the document; and (9) downloading the document using an access code.

13.     Attached hereto as **Exhibit 6** is a true and correct copy of the New Jersey Secretary of State's Business Entity Short Form Standing Certificate for Organon & Co. that I downloaded using the foregoing process.

DECLARATION OF NICOLE N. KING

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

14.     On March 7, 2022, I requested a copy of the Delaware Division of Corporations Short Form Standing Certificate for Organon LLC.  I found this form by: (1) typing the following URL address into the Delaware Division of Corporations website into my search bar: https://icis.corp.delaware.gov/ecorp2/services/e-filing; (2) selecting the link for "certificate request;" (3) selecting the link for "Document Upload;" (4) entering certification request information for the company name "Organon LLC" into the box labeled "Corporation Name;" (5) selecting the method of return, "Fed Ex;" (6) selecting the link labeled "Continue;" (7) purchasing the document; and (8) receiving the document via Fed Ex delivery on March 9, 2022.

15.     Attached hereto as **Exhibit 7** is a true and correct copy of the Delaware Division of Corporations Short Form Standing Certificate for Organon LLC that I received via Fed Ex using the foregoing process.

16.     On March 7, 2022, I downloaded a PDF of the New Jersey Secretary of State's Entity Details for Organon LLC.  I found this form by: (1) typing the following URL address into the New Jersey Secretary of State Business Search website into my search bar: https://www.njportal.com/DOR/businessrecords/Default.aspx; (2) selecting the link for "Business Entity Standing Certificates;" (3) selecting the link for "Business Name;" (4) entering the company name "Organon LLC" into the box labeled "Business Name;" (5) selecting the link labeled "Continue;" (6) selecting the first box under the heading "Short Form;" (7) adding the document to the cart; (8) purchasing the document; and (9) downloading the document using an access code.

17.     Attached hereto as **Exhibit 8** is a true and correct copy of the New Jersey Secretary of State's Business Entity Short Form Standing Certificate for Organon LLC that I downloaded using the foregoing process.

DECLARATION OF NICOLE N. KING

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

18.     On March 9, 2022, I viewed the electronic copy of the California Secretary of State's Statement of Information for Organon LLC.  I found this form by: (1) typing the following URL address into the California Secretary of State Business Search website into my search bar: https://businesssearch.sos.ca.gov/; (2) entering the company name "Organon LLC" into the box labeled "Search Criteria;" (3) selecting the box labeled "LP/LLC Name;" (4) selecting the link labeled "Search;" and (5) selecting the second displayed link labeled "Organon LLC."

19.     Attached hereto as **Exhibit 9** is a true and correct copy of the California Secretary of State's Statement of Information for Organon LLC, filed on May 17, 2021, that I accessed using the foregoing process.  This document's ultimate electronic location is: https://businesssearch.sos.ca.gov/CBS/Detail.

20.     I declare under penalty of perjury under the laws of the United States, that the foregoing is true and correct.

Executed on April 15, 2022, at Los Angeles, California.

Nicole N. King

DECLARATION OF NICOLE N. KING

# EXHIBIT 1

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*



FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

Electronically
**FILED**
by Superior Court of California
County of Ventura
03/04/2022
Brenda L. McCormick
Executive Officer and Clerk
Jeanette Fimbres
Deputy Clerk

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
MERCK & CO., INC., a New Jersey Corporation; MERCK SHARP & DOHME
CORP. a New Jersey Corporation; ORGANON & CO., a Delaware Corporation;
ORGANON LLC, a Delaware Limited Liability Company; and DOES 1-10, Inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
KATHERINE O'BRIEN, an individual,

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO!* Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (*www.sucorte.ca.gov*), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (*www.lawhelpcalifornia.org*), en el Centro de Ayuda de las Cortes de California, (*www.sucorte.ca.gov*) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Ventura County Superior Court<br>800 South Victoria Avenue, Ventura, CA 93009<br>Hall of Justice | CASE NUMBER:<br>*(Número del Caso):*<br>56-2022-00563317-CU-PO-VTA |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Shehnaz M. Bhujwala, SBN# 223484, Boucher, LLP, 21600 Oxnard St., Suite 600, Woodland Hills, CA 91367
(818) 340-5400

| DATE:<br>*(Fecha)* 03/04/2022 | Brenda L. McCormick | Clerk, by<br>*(Secretario)* | | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)* Jeanette Fimbres
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Merck & Co Inc

under: ☒ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☒ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1  Kevin P. Roddy, CA State Bar No. 128283
      *kroddy@wilentz.com*
2  WILENTZ, GOLDMAN & SPITZER, P.A.
   90 Woodbridge Center Drive, Suite 900
3  Woodbridge, New Jersey 07095
   Tel:    (732) 855-6402
4
   Kimberly Beck, *Pro Hac Vice*
5     *kim@becklawcenter.com*
   BECK LAW CENTER
6  201 E. 5th Street, Suite 1900
   Cincinnati, Ohio
7  Tel:    (888) 434-2912

8  Shehnaz M. Bhujwala, CA State Bar No. 223484
      *bhujwala@boucher.la*
9  BOUCHER LLP
   21600 Oxnard Street, Suite 600
10 Woodland Hills, California 91367-4903
   Tel:    (818) 340-5400
11 Fax:    (818) 340-5401

12 *Attorneys for Plaintiff*

13            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14                        **COUNTY OF VENTURA**

15

16 KATHERINE O'BRIEN, an individual,          Case No.  56-2022-00563317-CU-PO-VTA

17              Plaintiff,                     **COMPLAINT FOR DAMAGES AND
                                               DEMAND FOR JURY TRIAL**
18         v.
                                               1. **STRICT LIABILITY - DESIGN**
19 MERCK & CO., INC., a New Jersey               **DEFECT**
   Corporation; MERCK SHARP & DOHME           2. **STRICT LIABILITY - FAILURE**
20 CORP. a New Jersey Corporation;              **TO WARN**
   ORGANON & CO., a Delaware Corporation;     3. **NEGLIGENCE**
21 ORGANON LLC, a Delaware Limited            4. **NEGLIGENT**
   Liability Company; and DOES 1-10, Inclusive,  **MISREPRESENTATION**
22                                             5. **BREACH OF EXPRESS**
                                                 **WARRANTY**
23              Defendants.                    6. **BREACH OF IMPLIED**
                                                 **WARRANTY**
24

25

26

27

28


Electronically **FILED**
by Superior Court of California
County of Ventura
03/04/2022
Brenda L. McCormick
Executive Officer and Clerk
Jeanette Fimbres
Deputy Clerk

---

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

Plaintiff KATHERINE O'BRIEN, an individual, (hereinafter "Plaintiff"), alleges the following facts and claims for relief against Defendants MERCK & CO., INC. a New Jersey Corporation, MERCK SHARP & DOHME CORP., a New Jersey Corporation, (collectively referred to as "Merck Defendants" or "Merck"), Organon & Co., a Delaware Corporation, and Organon LLC, a Delaware Limited Liability Company (collectively referred to as "Organon Defendants" or "Organon") and DOES 1 through 10, inclusive, (all collectively referred to herein as "Defendants") and requests a trial by jury of all issues and causes of action so triable:

## INTRODUCTION

1.      KATHERINE O'BRIEN has developed neuropsychiatric injuries as a result of ingesting Defendants' prescription pharmaceutical product, Singulair®, indicated for: a) prophylactic and chronic treatment of asthma; b) acute prevention of exercise- induced bronchoconstriction (EIB); and c) relief of symptoms of allergic rhinitis.

2.      Merck Defendants knew or should have known of the risks of neuropsychiatric injuries prior to the time they began selling Singulair® in 1998. In 1996, Defendant Merck & Co., Inc. filed a patent application for montelukast, the active ingredient in Singulair®, acknowledging montelukast's possible effects on cerebral spasm. Further, montelukast has been tested extensively starting prior to 1998, and continuing through today. Many of these studies have demonstrated a correlation—and some show causation—between Singulair® usage and the development of neuropsychiatric events. Merck Defendants have ignored these studies.

3.      Originally, the Singulair® label contained no warnings regarding neuropsychiatric events. Over the past 24 years Merck Defendants have slowly and belatedly added grossly insufficient warnings regarding neuropsychiatric events to the product label. Finally, on March 4, 2020, the Food & Drug Administration (FDA) required Merck Defendants to add a Black Box Warning, the strongest type of warning, to Singulair®'s label, regarding neuropsychiatric events. FDA also required a new Medication Guide.

4.      The new Black Box warning provides "serious neuropsychiatric events have been reported in patients taking Singulair®." These include:

agitation, aggressive behavior or hostility, anxiousness, depression, disorientation,

2

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

disturbance in attention, dream abnormalities, dysphagia (stuttering), hallucinations, insomnia, irritability, memory impairment,obsessive-compulsive symptoms, restlessness, somnambulism, suicidal thoughts and behavior (including suicide), tic, and tremor...

Psychiatric disorders: agitation including aggressive behavior or hostility, anxiousness, depression, disorientation, dream abnormalities, hallucinations, insomnia, irritability, restlessness, somnambulism, suicidal thinking andbehavior (including suicide), tremor *[see Warnings and Precautions (5.4)]*.[1]

The new warning goes on to state "the benefits of Singulair® may not outweigh the risks...".

5.      Merck Defendants also modified the drug labeling Section 5.1 to disclose some neuropsychiatric events that were reported after Singulair® discontinuation as well as acknowledge montelukast, the active ingredient in Singulair®, distribution into the brain in rats. In addition, Merck Defendants modified Section 12.3 to remove the word 'minimal' from the description of montelukast distribution into the brain.

6.      In its March 4, 2020, press release FDA noted that "many patients and health care professionals are not fully aware of these risks." Further, by requiring the addition of the Black Box warning, the FDA "aims to make sure patients and medical providers have the information available to make informed treatment decisions."

## PARTIES

7.      Plaintiff is a competent individual over the age of 18. Plaintiff is a citizen and resident of Ventura County, California. At all times relevant herein, Plaintiff was a citizen and resident of California. At all relevant times herein, Plaintiff was prescribed Singulair® in California. Plaintiff ingested Singulair® in California and sustained injuries therefrom in California.

8.      Plaintiff was prescribed Singulair from 2015 to 2017.  Plaintiff's prescriptions were filled with branded and/or generic Singulair.  Plaintiff used Singulair as prescribed.  As a direct and proximate result of ingesting Singulair®, Plaintiff suffered neuropsychiatric injury including

---

[1] Merck Sharp & Dohme Corp., a subsidiary of Merck & Co., Inc., "Full Prescribing Information: Singulair® (montelukast sodium) Tablets, Chewable Tablets, and Oral Granules [US Patent No. 5,565,473]," Reference ID: 3106826 (Whitehouse Station, NJ: Merck & Co., Inc., 1998, revised Mar. 2012): 3-4, § 5.4: Neuropsychiatric Events; 6-7, § 6.2: Post-Marketing Experience. Accessed at https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/021409s036lbl.pdf.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1 general anxiety, social anxiety, panic disorder, and depression.

2      9.     Plaintiff became symptomatic while using Singulair®.

3      10.    Had Plaintiff or the prescriber known that Singulair® could cause Plaintiff to suffer
4 neuropsychiatric events, theprescriber would not have prescribed Singulair®, Plaintiff would not
5 have ingested Singulair®. Plaintiff has incurred medical expenses and will continue to incur
6 expenses in connection with medical treatment as a result of these injuries, which were caused by
7 Merck Defendants' conduct with respect to Singulair®'s design, labeling, manufacture, marketing,
8 and sale. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, trauma,
9 and loss of enjoyment of life as a result of these injuries, have suffered lost earnings and/or a loss
10 of earning capacity, and other injuries and damages to be proven at trial.

11      11.    On information and belief, Merck Defendants are, and at all relevant times herein
12 were, multi-national pharmaceutical corporations organized under the laws of New Jersey, with their
13 principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033, and doing
14 business in California. On information and belief, Merck Sharp & Dohme Corp. is, and at all
15 relevant times was, registered with the California Secretary of State to do business in California.

16      12.    Merck Defendants had exclusivity with respect to Singulair® and were the exclusive
17 manufacturers, distributors, and sellers of Singulair® from 1998 to mid-2012. Merck Defendants
18 have maintained control of brand name Singulair® at least into 2020 and possibly still maintain
19 control.

20      13.    On information and belief, the Merck Defendants "spun off" Singulair to their
21 subsidiary, Organon & Co., sometime after the FDA ordered Merck to add the Black Box warning
22 to Singulair's label. On information and belief, Organon & Co. is, and at all relevant times herein
23 was, a corporation organized under the laws of Delaware, with a principal place of business at 30
24 Hudson Street, Floor 33, Jersey City, New Jersey 07302, and doing business in California. On
25 information and belief, Organon LLC is a subsidiary of Organon & Co. that distributed Singulair to
26 Californians, including Plaintiff. On information and belief, Organon LLC is, and at all relevant
27 times herein was, a Delaware limited liability company with a principal place of business at 30
28 Hudson Street, Floor 33, Jersey City, New Jersey 07302. On information and belief, Organon & Co.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1   and Organon LLC ("Organon") are, and at all relevant times were, registered with the California

2   Secretary of State to do business in California.

3       14.    On information and belief, subject to discovery regarding the relationship of the

4   Merck Defendants to Organon, either Merck Defendants or Organon may be liable for injuries

5   caused by Singulair after FDA directed a black box warning to be added to Singulair before it was

6   added and physicians, pharmacists and patients were appropriately notified.

7       15.    Plaintiff is informed and believes, and thereon alleges that, at all relevant times, the

8   Merck Defendants and after transfer of the Singulair NDAs to it, Organon, conducts and at all

9   relevant times conducted substantial, continuous business in California.

10       16.    The Merck defendants manufactured, marketed and sold millions of Singulair pills,

11   including the actual Singulair pills that Plaintiff used in California during and prior to 2012.

12       17.    Since 2012, the Merck defendants have continued to manufacture, market, and sell

13   Singulair in California at least into 2020 and either the Merck Defendants or Organon did so after

14   2020.

15       18.    On information and belief, Merck Defendants and/or Organon may have

16   subsequently manufactured, marketed and sold the actual Singulair pills used by Plaintiff in

17   California.

18       19.    Merck defendants engaged in an extensive campaign to educate physicians in

19   California about the alleged benefits of Singulair, and further misrepresented the safety of Singulair

20   to physicians in California during this campaign.

21       20.    Merck Defendants engaged in extensive Direct-to-Consumer advertising in

22   California including print ads in magazines sold in California as well as television advertising on

23   television channels airing in California.

24       21.    Plaintiff is ignorant of the true names and capacities of defendants sued herein as

25   Does 1 through 10 and therefore sue these defendants by such fictitious names pursuant to California

26   Code of Civil Procedure section 474. Plaintiff is informed and believes, and upon such information

27   and belief, alleges, that each of the defendants designated as a Doe are legally responsible in some

28   manner for the events and happenings and caused damages, as alleged herein. Plaintiff will seek

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1 | leave of the Court to amend this Complaint to show the true names and capacities of the defendants,
2 | designated as Does, when the same has been ascertained.

3 |      22.    Plaintiff is informed and believes, and on that basis alleges, that at all times
4 | mentioned herein, there existed a unity of interest and ownership among Defendants and each of
5 | them, such that any individuality and separateness between Defendants, and each of them, ceased
6 | to exist. Defendants and each of them, were the successors-in-interest and/or alter egos of the other
7 | Defendants, and each of them, in that they purchased, controlled, dominated and operated each other
8 | without any separate identity, observation of formalities, or other manner of division. To continue
9 | maintaining the façade of a separate and individual existence between and among Defendants, and
10 | each of them, would allow Defendants to perpetrate a fraud and an injustice.

11 |      23.    Plaintiff is informed and believes, and on that basis alleges, that at all times
12 | mentioned herein, Defendants and each of them were the agents, representatives and/or employees
13 | of each and every other Defendant. In doing the things hereinafter alleged, Defendants and each of
14 | them, were acting within the course and scope of said alternative personality, capacity, identity,
15 | agency, representation and/or employment and were within the scope of their authority, whether
16 | actual or apparent. Plaintiff is informed and believes, and on that basis alleges, that at all times
17 | mentioned herein, Defendants and each of them were the trustees, partners, servants, joint venturers,
18 | shareholders, contractors, and/or employees of each and every other Defendant, and the acts and
19 | omissions herein alleged were done by them, acting individually, through such capacity and within
20 | the scope of their authority, and with the permission and consent of each and every other Defendant
21 | and that said conduct was thereafter ratified by each and every other Defendant, and that each of
22 | them is jointly and severally liable to Plaintiff.

23 | **JURISDICTION AND VENUE**

24 |      24.    Venue is proper in this Court because Plaintiff is a citizen and resident of Ventura
25 | County, California. During and prior to 2012, Plaintiff purchased and used Merck Defendants'
26 | Singulair in Ventura County, and thereafter may have used generic and/or branded Singulair in
27 | Ventura County. All of the Singulair ingested in California caused Plaintiff's injuries in that county.
28 | Further on information and belief, Defendants made misrepresentations regarding the safety of

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1   Singulair to physicians in Ventura County, California.

2       25.    The California Superior Court has jurisdiction over all Defendants because, based on

3   information and belief, each is a corporation and/or entity and/or person organized under the laws

4   of having its principal place of business in the State of California, a foreign corporation or

5   association authorized to do business in California and registered with the California Secretary of

6   State, or that has sufficient minimum contacts in California, is a citizen of California, or otherwise

7   intentionally avails itself of the California market so as to render the exercise of jurisdiction over it

8   by the California courts consistent with traditional notions of fair play and substantial justice.

9       26.    Further, Defendants have each purposefully availed themselves of the benefits and

10  protections of the laws within the State of California. Collectively, Defendants conduct substantial,

11  continuous, and systemic business in California and have had sufficient contact with California such

12  that the exercise of jurisdiction would be consistent with the traditional notions of fair play and

13  substantial justice.

14  **FACTUAL ALLEGATIONS**

15  **A. Merck's Discovery of Montelukast**

16      27.    Merck Defendants discovered the anti-asthmatic properties of montelukast, the

17  active ingredient in Singulair® and were granted U.S. Patent No. 5,565,473 on October 15, 1996,

18  which expired on August 3, 2012. FDA first approved Singulair® for clinical use in 1998.

19      28.    Singulair® has become a ubiquitous monotherapy treatment as an alternative to, and

20  as an add-on therapy to inhaled corticosteroids (ICS) such as fluticasone. Approximately 9.3 million

21  patients received a dispensed montelukast prescription from U.S. outpatient pharmacies in 2018,

22  with 2.3 million of these being children younger than 17 years.[2]

23      29.    Singulair® (montelukast) is a leukotriene receptor antagonist that binds with high

24  affinity and selectivity to the cysteinyl leukotriene receptor-1 (CysLTR1) in order to prevent this

25

26  [2] U.S. Food and Drug Administration, Drug Safety Communications, *FDA requires Boxed Warning about serious mental health side effects for asthma and allergy drug montelukast (Singulair®); advises restricting use for allergic*

27  *rhinitis: Risks may include suicidal thoughts or actions*," 3-4-2020 FDA Drug Safety Communication (Mar. 4, 2020) (citing IQVIA Total Patient Tracker™. Year 2018. Data extracted June 2019). Accessed at

28  https://www.fda.gov/media/135840/download.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

receptor from interacting with leukotrienes, which are inflammatory mediators. Such binding consequently assists in inhibiting many of the physiological actions elicited by CysLTs at the receptor which could have facilitated asthma or allergic rhinitis. As an example, montelukast modulates expression of CysLTR1 and CysLTR2 in airway eosinophilic (i.e., high count of white blood cells) inflammation of OVA-induced asthmatic mice because the drug functions in bodies as a CysLT1 receptor antagonist.[3]

30.     Cysteinyl leukotrienes (CysLT) are eicosanoids (i.e., signaling molecules) that are released by various types of cells, including mast cells and eosinophils, both of which are implicated in allergy and anaphylaxis as well as the immune system. When these CysLT bind to their corresponding CysLT receptors (e.g., CysLT binding to CysLT1R), they may act to up- or down-regulate the receptor and its coordinating effect. For example, CysLT1 binding to CysLT1 receptors found on smooth muscle cells in respiratory airways simulates specific cell activities that then facilitate the underlying pathophysiology of asthma and allergic rhinitis.

31.     Facilitating conditions for asthma include CysLT-mediated airway bronchoconstriction, vascular permeability, occluding mucous secretion, and eosinophil recruitment. In allergic rhinitis, nasal mucosa release CysLTs when exposed to allergens like pollen during both early- and late-phase reactions and then participate in eliciting the prototypical symptoms of allergic rhinitis like a congested nose and congested airway. Simply put, if allergens (e.g., dust and pollen) are the gasoline and CysLTs are the gas pedal that drive the asthma and allergies engine, Singulair® hits the brakes.

**B. Singulair Crosses the Blood-Brain-Barrier and Causes Neuropsychiatric Events.**

**a. Introduction to the Blood-Brain-Barrier**

32.     Montelukast crosses the blood-brain barrier (BBB), which is a semi-permeable (i.e., partial porous) membrane of endothelial cells (blood and lymphatic vessel lining) that is highly

---

[3] Zhang YJ, Zhang L, Wang SB, Shen HH, Wei EQ. Montelukast modulates lung CysLT(1) receptor expression and eosinophilic inflammation in asthmatic mice. *Acta Pharmacol Sin.* 2004;25(10):1341-1346 (Finding that montelukast inhibited the up-regulation of the CysLT1 receptor in airway eosinophilic inflammation of ovalbumin- induced (i.e., egg whites) asthmatic mice.

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1  selective in preventing solutes in circulating blood from non-selectively entering the extracellular

2  fluid (e.g., cerebrospinal fluid) and thereby interacting with neurons in the central nervous system

3  (CNS). The CNS influences activity within all of the parts of the body and is constituted primarily

4  by the brain and spinal cord. Neurons function to communicate with other cells via connections

5  called synapses. Neurons are like telephones in that they receive signals and synapses are similar to

6  telephone lines that carry signals.

7      33.  .   The function of the BBB is to protect the brain from circulating pathogens and

8  thereby render bloodborne brain infections rare. No antibodies, only certain antibiotics, and

9  exceedingly few drugs in general may pass the BBB and thereby have an impact on the CNS.

10     34.     The clinical significance of the BBB is due to its difficulty as a drug target to

11 overcome. Difficulty may be attributed to its 100% exclusion of large-molecule neurotherapeutics

12 and 98% exclusion of all small-molecule drugs (e.g., anti-depressants like Prozac, anxiolytics like

13 Xanax).[4] In terms of size and rough complexity, if a small-molecule druglike aspirin (21 Daltons)

14 were a bicycle (~ 20 lbs), a large-molecule drug or small biologic like human growth hormone

15 (~3,000 Daltons) would be a Toyota Prius (~ 3,000 lbs), and a large biologic like immunoglobulin

16 G antibody (~ 25,000 Daltons) would be an F-16 fighter jet (~ 25,000 lbs without fuel).[5]

17     35.     Small molecules are considered anything less than 900 Daltons. A molecular weight

18 of 400 Daltons or less increases a drug's chances of penetrating the CNS.[9] Montelukast weighs

19 608.18 Daltons.

20     36.     Additionally, molecules with less than 8 hydrogen bonds have an increased

21

22 [4] See, e.g., Pardridge, William M. "The Blood-Brain Barrier and Neurotherapeutics." *NeuroRx.* 2005 Jan; 2(1): 1—
   Doi: 10.1602/neurorx.2.1.1; Pardridge. "The Blood-Brain Barrier: Bottleneck in Brain Drug Development." *NeuroRx.*
23 2005 Jan; 2(1): 3—14. Doi: 10.1602/neurorx.2..3

24 [5] Deepak Gupta et al. "A CMO Perspective on Quality Challenges for Biopharmaceuticals," *BioProcess Int'l* (Oct. 1,
25 2013,    9:00    AM),    accessed at    http://www.bioprocessintl.com/manufacturing/ antibody-non- antibody/a-
   cmo-perspective-on-quality-challenges-for-biopharmaceuticals-347335; *See also,* McNally, Eugene J., and Jayne E.
26 Hastedt. "Development of Drug Products: Similarities and Differences Between Protein Biologics and Small Synthetic
   Molecules." In *Protein Formulation and Delivery*, 2nd ed. Edited by Eugene J. McNally and Jayne E. Hastedt. Drugs and
27 the Pharmaceutical Sciences, Vol. 175 (Boca Raton, FL: CRC Press Taylor & Francis Group, 2008): 327—333, 328—
   329.

28

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

likelihood of penetrating the BBB. These are weak intermolecular (i.e., between molecules) bonds between a lone pair electron "donor" and an electron "acceptor." If the "acceptor" is the team, the lone pair "donor" is the person who is getting picked last. Montelukast has  4 hydrogen bond acceptors and 2 hydrogen bond donors. Rendering the drug capable of having only 6 hydrogen bonds. Because of this, montelukast has an inherent increased likelihood of penetrating the BBB.

37.    In order to deliver neurotherapeutic drugs to the brain to treat illnesses such as depression, schizophrenia, and obsessive-compulsive disorder, they must be able to cross the BBB. More lipid soluble or lipophilicity molecules are better able to penetrate the CNS.[6] Montelukast has been proven more lipid soluble than its sister class drug, Zafirlukast. In other words, because montelukast "likes" dissolving in fats or oils more than zafirlukast, montelukast is better able to cross the BBB.[7]

38.    Because montelukast crosses the BBB, it exerts a systemic effect upon the CNS that results in, among other things, adverse neuropsychiatric events.

### b.  Singulair Crosses the Blood-Brain-Barrier

39.    Montelukast crosses the BBB and thereby accumulates in the central nervous system (CNS), which is constituted by the brain and spinal cord. This drug accumulation occurs with both oral and intravenous doses, and in both humans and animals:

> Most importantly, **in a human subject taking 10 mg per day montelukast, that is, the approved dose to treat asthma, we detected [oral] montelukast in the serum and in the CSF** in a similar concentration as in the rats (Supplementary Fig. 1a), suggesting that the standard 10 mg per day dose in humans is sufficient to reach a therapeutic dose in the CSF. In addition, a re-analysis of the original CNS pharmacology data of montelukast27indicates a significant BBB penetrance of the drug (Supplementary Fig. 1b). **These data clearly demonstrate that orally administered montelukast does cross the BBB in a therapeutic dose,** and that age-dependent differential BBB integrity does not affect the capacity of montelukast to enter the brain…
>
> Remarkably, montelukast serum levels [following intravenous drug administrations  in rats] were almost identical to the maximum plasma

---

[6] E.g., Pardridge, William M., "Drug transport across the blood-brain barrier," J Cereb Blood Flow Metab. 2012 Nov; 32(11): 1959–1972. Published online 2012 Aug 29. doi: 10.1038/jcbfm.2012.126

[7] See Mougey, Edward B.; Hua Feng; Mario Castro, Charles G. Irvin, and John J. Lima, "Absorption of Montelukastis Transporter Mediated: a Common Varient of OATP2B1 is Associated with Reduced Plasma concentrations and Poor Response," [Author manuscript; available in *PMC* 2010 Feb 1] *Pharmacogenet Genomics*, 2009 Feb; 19(2): 129–138. doi: 10.1097/FPC.0b013e32831bd98c.

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

concentrations in humans after oral administration of the clinical dose of 10 mg montelukast daily… illustrating that the animals were treated with montelukast in adose that pharmacologically resembles the one that is approved forits use in humans.[8]

40. Studies show that expression of the CysLTR1 (including that bound with montelukast) is not limited to the lungs. Instead, it occurs in different cells in the brain, including microvascular endothelial cells—components of the blood brain barrier. Pre- clinical studies of human and animal model tissue implicate CysLTR1 antagonists (e.g., Singulair®/montelukast, Onon/pranlukast, and Accolate/zafirlukast) as exerting effects upon traumatic brain injuries (TBI), ischemic brain injuries (e.g., stroke, TIA), cold-induced brain injuries, multiple sclerosis, auto-immune encephalomyelitis, Alzheimer's disease, and Parkinson's disease.[9] Activation of CysLTR1 is associated in animals with facilitating pathogen entry into the brain by disrupting the Blood Brain Barrier (BBB).[10] Among these pathogens are HIV-1 and *Escherichia coli*-mediated meningitis.[11] Furthermore, "[i]t has been demonstrated that [Singulair®] could increase the proliferation of neuronal precursor cells in vitro through the receptors CysLT1R and GPR17 [(G protein-coupled receptor 17)]."[12] Accordingly, although "expression of the CysLT1R in the normal human brain is very low/non- existent," montelukast blockades GPR17 and thereby "strongly elevate[s] neural stem and progenitor proliferation."[13] In other words, montelukast affects nerve cell

---

[8] Marschallinger, J., Schäffner, I., Klein, B. *et al.* Structural and functional rejuvenation of the aged brain by an approved anti-asthmatic drug. *Nat Commun* 6, 8466 (2015), 4, 10. https://doi.org/10.1038/ncomms9466. (Emphasesadded).

[9] Ghosh A, Chen F, Thakur A, Hong H (2016). "Cysteinyl Leukotrienes and Their Receptors: Emerging Therapeutic Targets in Central Nervous System Disorders". CNS Neuroscience & Therapeutics. 22 (12): 943-951. doi: 10.1111/cns.12596. PMC 6492851. PMID 27542570.

[10] Bertin J, Jalaguier P, Barat C, et al. Exposure of human astrocytes to leukotriene C4 promotes a CX3CL1/fractalkine-mediated transmigration of HIV-1-infected CD4 + T cells across an in vitro blood–brain barriermodel. Virology 2014;454–455:128–138.

[11] Zhu L, Maruvada R, Sapirstein A, et al. Arachidonic acid metabolism regulates Escherichia coli penetration of the blood-brain barrier. Infect Immun 2010;78:4302–4310.

[12] Yohanna Eriksson, Martina Boström, Asa Sandelius Kaj Blennow, Henrik Zetterberg, Georg Kuhn, and Marie Kalm, The anti-asthmatic drug, montelukast, modifies the neurogenic potential in the young healthy and irradiated brain, *Cell Death and Disease* 9:775 (2018), 5. Doi 10.1038/s41419-018-0783-7. (citing Huber, C. et al. Inhibition ofleukotriene receptors boosts neural progenitor proliferation. *Cell. Physiol. Biochem.* 28, 793-804 (2011). doi: 10.1159/000335793.).

[13] Sansing-Foster, Veronica V., Ivone E. Kim, Dipti Kalra, Efe Eworuke, Lockwood G. Taylor, Lisa M. Harinstein,and Monica Munoz, "Neuropsychiatric Events with Use of Montelukast in Pediatric Patients," *FDA Briefing Document: Pediatric Advisory Committee Meeting*, (Sept. 27, 2019), p. 14, § 1.4.4. Accessed at https://www.fda.gov/media/131035/download.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

growth by expressing the activity of receptors.

41.     Singulair® accumulates in the brain at a rate that is higher than its accumulation in the lungs:

> Although montelukast was so far always considered as a drug with only limited CNS penetration, careful re-analysis of the original pharmacokinetic report on montelukast reveals that one hour after i.v. drug administration, a substantial amount of radioactive equivalents of [C14] montelukast (~1/10 of the plasma levels) had reached the brain (Supplementary Fig. 1b). Most remarkably, while in plasma (and most other organs, for example, lung and muscle) montelukast levels strongly decreased within 24 h, the amount of montelukast in the brain increased. As a consequence, **24 h after drug injection, montelukast levels in the brain were even higher than in plasma** (Supplementary Fig. 1b), suggesting the existence of an active transport mechanism for montelukast through the BBB.

42.     Singulair® accumulates in the brain because of its binding affinity to a BBB transporter:

> Indeed, montelukast is taken up from the intestine into the blood stream by the organic anion-transporting polypeptide (OATP)2B1, a transporter that is expressed also by endothelial cells of brain capillaries. Also, **the majority (99%) of montelukast in plasma is bound to proteins, mainly albumin, providing a BBB transport mechanism as albumin has been shown to act as a carrier through the BBB. The potential of montelukast to enter the CNS is further strongly supported by our present pharmacokinetic results obtained from rats** (Supplementary Fig. 1a).

43.     Pre-clinical data also provide ample evidence of how montelukast enters into the brain:

> Strikingly, montelukast was also detected in the CSF in a human asthma patient, who was on the approved 10 mg per day dose of montelukast, and levels in serum and CSF were almost identical to the concentrations found in rats treated with 10 mg kg$^{-1}$ montelukast (Supplementary Fig. 1a). **Entry of montelukast into the CNS is further supported by the plethora of preclinical data on the effects of systemic montelukast treatment on brain structure and function.** In various animal models of neurodegenerative diseases, including a model of kainic acid-induced loss of memory function, an acute Huntington's disease model of quinolinic acid and malonic acid injection-induced degeneration of striatal neurons, and a β-amyloid injection model of Alzheimer's disease, treatment with montelukast attenuated behavioural deficits, which was accompanied by structural brain changes such as inhibition of neuroinflammation and reduced neuronal cell death.[14]

---

[14] Marschallinger (2015), 10 (Emphases added); see also, Zhang WP, Hu H, Zhang L, et al. Expression of cysteinyl leukotriene receptor 1 in human traumatic brain injury and brain tumors. *Neurosci Lett.* 2004;363(3):247-251; LenzQF,

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

44.     Animal studies demonstrate that Singulair® administered orally can be found in the brain and cerebrospinal fluid (CSF) found in the subarachnoid space between the two innermost (arachnoid mater and pia mater) of three protective membranes covering the brain and spinal cord:

> The biologic mechanisms underlying the neuropsychiatric events associated with montelukast treatment are currently not well understood. However, evidence from animal studies suggests that montelukast could act directly on cells in the brain. Orally administered montelukast (10 mg/kg/day, 7 days) was **detectable in brain tissue and cerebrospinal fluid (CSF)** in rats, providing evidence for its **ability to cross the blood-brain barrier**.[15]

These studies' findings were cited within the FDA's Briefing Document re: Singulair®.[16] Thus, taking Singulair® results in the accumulation of its active ingredient, montelukast, in brain tissue and cerebrospinal fluid.

### c. Because Singulair® (Montelukast) Crosses the Blood-Brain-Barrier, It Can and Does Cause Neuropsychiatric Events.

45.     The risk of new neuropsychiatric events is greater in pediatric patients who take Singulair®. "Children with asthma who experienced suicidality (i.e., suicidal thoughts), depression, tics, tremors, stuttering, agitation, and night terrors. A new-onset neuropsychiatric event [have] nearly twice the odds of having been prescribed montelukast in the year before their event."[20]

---

et al., *Neuroscience*, 2014). Doi: 10.1016/j.neulet.2004.03.088.

[15] Zhao R, Shi WZ, Zhang YM, et al. Montelukast, a cysteinyl leukotriene receptor-1 antagonist, attenuates chronic brain injury after focal cerebral ischaemia in mice and rats. *J Pharm Pharmacol.* 2011;63(4):550-557; Zhang CT, Lin JR, Wu F, et al. Montelukast ameliorates streptozotocin-induced cognitive impairment and neurotoxicity in mice. *Neurotoxicology.* 2016;57:214-222 (Emphasis added). This study was also cited during the FDA hearings regarding Singulair®. Aladdin, Meena M., Ph.D., Health Researcher, Public Citizen's Health Research Group, "Testimony Before the FDA's Pediatric Advisory Committee and Drug Safety and Risk Management Advisory Committee – Neuropsychiatric Events with Use of Montelukast in Pediatric Patients," FDA.gov (Sept. 27, 2019). Accessed at https://www.fda.gov/media/131487/download. (quoting Food and Drug Administration. Guidance for industry: Warnings and precautions, contraindications, and boxed warning sections of labeling for human prescription drug and biological products — content and format. October 2011. https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM075096.pdf. Accessed September 26, 2019).

[16] FDA Briefing Document, p. 14, § 1.4.4 (citing Volpe C, Kalra D, A. N. *Pharmacovigilance Review of Neuropsychiatric and Churg-Strauss Syndrome* (Feb. 21, 2014); Kalra D, Gatti J, T P. *Pediatric Postmarketing Pharmacovigilance and Drug Utilization Review of Montelukast* (September 2, 2014)).

---

13

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1    Furthermore, "children prescribed montelukast for asthma management had nearly twice the odds

2    of neuropsychiatric events, compared with those on other asthma maintenance medications.[21]

3    46.    Additionally, a 2016 retrospective analysis of Individual Case Safety Reports

4    (ICSRs) recorded up to January 1, 2015, in the World Health Organization's (WHO) database

5    (VigiBase®), pulling from over 20 million reports of global suspected adverse effects of medicines.

6    Their findings were as follows:

> Neuropsychiatric disorders as side effects of montelukast were more frequently reported for children than for adults. Infants and children seem to be more prone to sleep disturbances, whereas adolescents present symptoms of depression/anxiety and psychotic reactions more often. Suicidal behavior and completed suicide appear to be more frequently reported than previously thought in practice…Practitioners should be aware of the risk of neuropsychiatric events associated with montelukast use, and should advise the patient and report new cases.[17]

Thus, the neuropsychiatric dangers posed by Singulair® are much greater for children than for adults. Children with new onset neuropsychiatric events are twice as likely to have taken Singulair®, and children who are taking Singulair® are twice as likely to have neuropsychiatric events when compared with those taking other drugs (e.g., inhaled corticosteroids). This is significant because inhaled corticosteroids are known to have **"severe adverse psychological effects including psychosis"**[18] which can also "manifest in cognitive disorders, behavioral changes, and frank psychiatric disease."[19]

47.    The risk of neuropsychiatric events associated with taking Singulair® are greater than those associated with taking ICS (e.g., albuterol). "In the real-life setting, children initiated on montelukast experience **a notable risk of neuropsychiatric ADRs leading to drug cessation,** that is significantly higher than that associated with [inhaled corticosteroids] ICS."[20]

---

[17] Ana Aldea Perona, Mar García-Sáiz, Emilio Sanz-Álvarez. Psychiatric Disorders and Montelukast in Children: A Disproportionality Analysis of the VigiBase®. *Drug Safe.* (Springer, 2016: New York, NY) 39:69-78, 69; see 76. Doi: 10.1007/s40264-015-0360-2. (n = 14,670 ICSRs, 2,630 neuropsychiatric events in people aged <18 years).

[18] Glockler-Lauf SD, Finkelstein Y, Zhu JQ, Feldman LY, To T. "Montelukast and Neuropsychiatric Events in Children with Asthma: A Nested Case-Control Study. *Journal of Pediatrics.* 2019;209:176-182.e4. doi: 10.1016/j.jpeds.2019.02.009. (n = 898 NAE, 3,497 matched controls, p = 0.01).

[19] Linda B. Drozdowicz and J. Michael Bostwick, "[Review:] Psychiatric Adverse Effects of Pediatric Corticosteroid Use," *Mayo Clin Proc.* June 2014: 817—834. Doi: http://dx.doi.org/10.1016/j.mayocp.2014.01.010.

[20] Benard B, Bastien V, Vinet B, Yang R, Krajinovic M, Ducharma FM. "Neuropsychiatric adverse drug reactions in

---

14

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

48.     Suicidality (i.e., suicidal thoughts) and suicide are a very real risk of taking Singulair®. "Suicidal behavior and completed suicide appear to be more frequently reported than previously thought in practice…Practitioners should be aware of the risk of neuropsychiatric events associate with montelukast use and should advise the patient and report new cases." (n = 14,670 Individual Case Safety Reports for montelukast).[21] Additional studies have found,

> "[M]ontelukast is associated with neuropsychiatric adverse drug reactionssuch as depression and aggression [and nightmares in children]."[27] Additionally, "[adverse drug reactions in published case reports] includedagitation, anxiety, depression, sleep disturbance, hallucinations, **suicidal thinking and suicidality, tremor,** drowsiness, neuropathies, and seizures." Further, immune system, induction of hypersensitivity reactions, and hepatobiliary/pancreatic/uropoietic disorders "**are characterized by severe prognosis (i.e., neurological deficit and fatal hepatotoxicity.**[22]

49.     Singulair® causes a decrease in neuronal proliferation (nerve growth) in the hippocampal neurogenic zone (part of the brain largely involved in things from short-term memory to long-term memory, and spatial memory). Montelukast can cause "**negative effects both acutely and after 2 weeks of daily administration of montelukast.**"[23]  In short, giving Singulair® to healthy children can delay their nerve growth in the part of the brain that is most important to short-term memory, long-term memory, and spatial memory. Furthermore, alterations in the hippocampus have been linked to a variety of cognitive pathologies such as anxiety, depression, addiction and neurodegenerative diseases such as Parkinson's.[24]

**C. Defendants Knew the Risks of Neuropsychiatric Events but Failed to Warn**

---

children initiated on montelukast in real-life practice." *Eur Respir J.* 2017 Aug 17;50(2). Doi: 10.1183/13993003.00148-2017. Print 2017 Aug. (n = 12; ci = 95%) (Cited by 5 other articles) (Emphasis added).

[21] Aldea Perona A, García-Sáiz M, Sanz Álvarez E. "Psychiatric Disorders and Montelukast in Children: A Disproportionality Analysis of the VigiBase (®)." *Drug Saf.* 2016 Jan;39(1):69-78. Doi: 10.1007/s40264-015- 0360-2. (Cited by 8 other articles) (Emphasis added); *See* Aladdin, Menna M. "Testimony Before the FDA's Pediatric Advisory Committee and Drug Safety and Risk Management Advisory Committee – Neuropsychiatric Events with Use of Montelukast in Pediatric Patients." Sept 27, 2019. Accessed at https://www.fda.gov/media/131487/download.
[22] Calapai G, Casciaro M, Miroddi M, Calapai F, Navarra M, Gangemi S. "Montelukast-induced adverse drug reactions: a review of case reports in the literature." *Pharmacology.* 2014;94(1-2):60-70. Doi: 10.1159/000366164.(Emphasis added).

[23] *Id* at 6.

[24] See 5. Sapolsky R. M., "Glucocorticoids and hippocampal atrophy in neuropsychiatric disorders," *Arch Gen Psychiatry.* 2000;57:925–935. Doi: 10.1001/archpsyc.57.10.925.

15

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

**Prescribers, Parents or Patients of the Risks, and Even Misrepresented the Safety of Singulair.**

50.　　When Singulair was originally approved by the FDA, it had no warnings regarding neuropsychiatric events.

51.　　Merck knew that Singulair crosses the blood-brain-barrier from pre-clinical trials, conducted prior to original approval.

52.　　Specifically, Merck Defendants misled the FDA with purpose and intent in its original New Drug Application (NDA) 20.829 and 20.830 which were used to obtain FDA approval for Singulair®5mg intravenous dosing. The footnotes to Table 4 of said NDAs state "only trace amounts were detected in the brain" and "radioactivity in all tissues declined with time, and the remaining radioactive equivalents in tissues were very low at 24 hour post dose". However, Table 4 in factdemonstrates the amount of radiolabeled drug in the brain increased over time and when lookedat as a ratio of brain:plasma, 0.041:0.142, **the 24 hour interval the level in the brain is 3.46 times or 346% greater than in the plasma.** Furthermore, from 1 hour post administration to the 24 hour interval the radioactive level of drug in the **plasma decreased by 96.64%,** whereas the radioactive level of drug in the **brain increased by 21.36% if you are just looking at volume in each specific tissue and not a ratio of brain: plasma.** Despite this data being statistically significant, Merck Defendants neglected to study the effects on the brain in clinical trials and misled the FDA in the way they reported their data.[25]

53.　　Two years before it was permitted to sell Singulair® in the United States,Defendant Merck obtained a patent for montelukast. In the patent application, ***DefendantMerck claimed that montelukast is "useful in treating …cerebral spasm,"[26]*** admitting that at least by 1996, Merck Defendants knew montelukast could affect the brain.  Nonetheless,  the Singulair® label from the day Merck Defendants began sales in 1998 contained no warning of Singulair®'s possible effect on

---

[25] Merck, "Table 4: Radioactive Equivalents ("ug/g or ug/ml) of 1[14C]Montelukast in the Tissues of Rats Receiving 5 mg/kg i.v. (Mean ± SD; n=3) [Sponsors Table 17 Ref. G-1 Vol. 29 pp. G-65]" [brackets original], *NDA 20.829 and 20.830*, 13.

[26] U.S. Patent No. 5,565,473

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1    the brain, let alone of neuropsychiatric events.

2        54.    Two and a half years after approval, on August 2, 2001, the "Post-Marketing

3    Experience" section of Singulair's label was changed to state that "dream abnormalities and

4    hallucinations, drowsiness, irritability, agitation including aggressive behavior, restlessness [and]

5    insomnia" have been observed.

6        55.    This label change should have occurred earlier through the Changes Being Effected

7    ("CBE") Process.  Merck had Newly Acquired Information ("NAI"), which would have permitted

8    Merck to make this label change under the CBE.

9        56.    Specifically, Merck should have conducted new analysis of clinical and preclinical

10   testing data.  The NAI would have been derived from the new analysis.

11       57.    On June 23, 2004, the term "insomnia" was changed to "trouble sleeping."  Merck

12   made this change using the "Changes Being Effected" process.

13       58.    Just five days after Merck changed "insomnia" to "trouble sleeping," Merck

14   overhauled Singulair's label using CBE.

15       59.    "Psychomotor hyperactivity" was added to the overdose section of the label on June

16   27, 2005.

17       60.    The 2005 revision should have been made earlier through the CBE process through

18   reanalysis of existing preclinical and clinical data.

19       61.    Through the CBE process, Merck added the term "suicide" and replaced

20   "psychomotor hyperactivity" with the "anxiousness" in the "Post-Marketing Experience"

21   subsection of the Package Insert and the "Less Common Side Effects" section of the patient package

22   insert.

23       62.    The NAI information that enabled Merck to add the term "suicide" on information

24   and belief, would have also enabled Merck to add the term "suicidality," which should have been

25   added and explained.

26       63.    This should have triggered Merck to engage in reanalysis of the data already

27   submitted to the FDA or conduct additional tests to determine the extent of the dangers of

28   neuropsychiatric injuries.  Upon information and belief, Merck did not conduct a reanalysis or

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1 │ additional testing.

2 │      64.    When Merck added the terms "suicide" and "anxiousness" through the CBE, Merck

3 │ should have made the warnings regarding those injuries stronger.

4 │      65.    On August 19, 2009, FDA approved revisions to the PRECAUTIONS and

5 │ ADVERSE REACTIONS sections of the label.

6 │      66.    These revisions should have been made earlier and when made should have been

7 │ more pronounced based on information Merck knew or should have known from reanalysis of

8 │ preclinical and clinical trials.

9 │      67.    These revisions should have been more strongly worded based on the increasing

10 │ body of publicly available scientific literature regarding montelukast.

11 │      68.    These revisions should have been more strongly worded based on post-marketing

12 │ surveillance information available to the Merck Defendants.

13 │      69.    Merck used the CBE to add the term "disorientation" to the "Warnings, Precautions

14 │ and Adverse Events" section of the label on April 14, 2010.

15 │      70.    Again, using CBE Merck added the term "tic" to the "Post-Marketing Experience"

16 │ and "Neuropsychiatric Events" sections of the Prescribing Information.  On the same date, using the

17 │ CBE, Merck added "uncontrolled muscle movements" to the Patient Information Leaflet.

18 │      71.    These revisions should have been more strongly worded, more pronounced, and

19 │ should have been made sooner based on all the "newly acquired information" available to Merck,

20 │ including but not limited to reanalysis of clinical and preclinical studies, publicly available articles,

21 │ and post-marketing information.

22 │      72.    In June 2018, through CBE, Merck added the term "obsessive-compulsive

23 │ symptoms" to several sections of the label.

24 │      73.    On information and belief, using the CBE process, Merck should have strengthened

25 │ all of the neuropsychiatric warnings, including those involving obsessive-compulsive symptoms

26 │ prior to that time.

27 │      74.    "Dysphemia (stuttering)" was added to the Singulair label on February 13, 2019,

28 │ through CBE.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

75. In November 2017, several patient advisory groups petitioned the FDA to strengthen Singulair's warnings with regard to neuropsychiatric events.

76. On September 27, 2019, the Pediatric Advisory Committee and the Drug Safety and Risk Management Advisory Committee of the FDA held a hearing to discuss the patient advisory groups' requests.

77. Following that hearing, the FDA required the Merck defendants to add a black box warning to the Singulair label.

78. Merck Defendants and/or Organon revised the label to include the black box warning.

79. These revisions should have been made much sooner based on adverse event and other post-marketing information as well as reanalysis of existing studies and scientific literature.

80. All of these revisions should have been made earlier and when made should have been more pronounced and should have included stronger language based on information Merck knew or should have known from reanalysis of preclinical and clinical trials.

81. All of these revisions should have been made earlier and when made should have been more pronounced and should have included stronger language based on information Merck knew or should have known from the increasing body of publicly available articles regarding montelukast.

82. All of these revisions should have been made earlier and when made should have been more pronounced and should have included stronger language based on information Merck knew or should have known from post-marketing surveillance information available to the Merck Defendants.

83. For example, by 2015, over a quarter of the adverse events reported to the FDA included neuropsychiatric adverse events, including serious adverse events, such as homicidal and suicidal ideation, psychosis, and hallucinations, totaling thousands of such reports and over 25% of the total adverse events reported. Furthermore, the United States General Accounting Office has testified before Congress that, "Experts believe that FDA's [Adverse Event Reporting System (AERS) system [only] includes a n estimated 1 to 10 percent of adverse reactions."

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

84.     Indeed, every year since Singulair®'s launch in 1998, neuropsychiatric adverse event reports involving children two months to 17 years of age have been filed with the FDA in connection with Singulair®. In 1998 alone, 10 neuropsychiatric adverse events involving children were reported. In 1999, an additional 83 adverse events were reported. Sixty-six more children using Singulair® suffered neuropsychiatric adverse events in 2000. By 2020, a total of 3,135 children suffered such events, as reported to the FDA, including 242 children under 24 months of age. Furthermore, the United States General Accounting Office has testified before Congress that, "Experts believe that FDA's [Adverse Event Reporting System (AERS) system [only] includes a n estimated 1 to 10 percent of adverse reactions."[27]

85.     Plaintiff would not have used Singulair if he knew the risks of neuropsychiatric events.

### D. The NDA Holder (aka "Brand") is Responsible for Label Revisions.  The ANDA Holders (aka "Generics") Must Make the Label on Generic Drugs Substantially the Same as the Brand.[28]

86.     In August 2012, Merck's United States patent expired for Singulair. Immediately thereafter, the FDA approved a number of generic forms of Singulair for sale in the United States. Notwithstanding the availability of generic forms of Singulair Merck has continued to manufacture, distribute, and market Singulair in its brand-named form throughout the United States, including in California.

87.     As the brand-name manufacturer of Singulair, Defendants had and have a duty to maintain the accuracy and adequacy of the label for Singulair for as long as the drug is on the market. As the brand-name manufacturer of Singulair, Defendants were not only in the best position to warn of Singulair's harmful effects, but were also the only manufacturers with the unilateral authority

---

[27] Janet Heinrich (Assoc. Dir. Health Fin. And Pub. Health Issues, Health and Human Serv. Div.), "Adverse Drug Events: Substantial Problem but Magnitude Uncertain [GAO/T-HEHS-00-53]," *Testimony: Before the Committee on Health, Education, Labor, and Pensions, U.S. Senate* (United States General Accounting Office:Tues Feb. 1, 2000), 6. Accessed at https://www.gao.gov/new.items/he00053t.pdf.

[28] "Defendants" in this section refer to the Merck Defendants at least until 2020, and thereafter if the Merck Defendants continued to hold the NDA.  If the NDA was transferred to Organon in 2020, these allegations apply to the Merck Defendants up to the time of transfer and to Organon thereafter.

1 under federal law to issue such a warning.

2     88.    Generic manufacturers for the bioequivalent of Singulair have only the duty to ensure

3 their labels for generic bioequivalent to Singulair are the same as the label used by the brand name

4 manufacturer, here, Defendants. Indeed, such sameness is required. As such, Defendants exercised

5 complete control over the contents of the generic drug label attached to any generic Singulair

6 Plaintiff may have used.

7     89.    As a result, Defendants knew that any deficiencies in the label for Singulair would

8 be perpetuated in the label of its generic bioequivalent. Accordingly, it is foreseeable that the

9 warnings included or omitted on the brand-name drug label would influence dispensing of the

10 generic drug.

11     90.    As the brand name manufacturer of Singulair, Defendants had and have a duty to

12 update its warning label "as soon as there is a reasonable evidence of an association of a serious

13 hazard with a drug; a causal relationship need not have been proved." 21 C.F.R. § 201.80(e).

14     91.    As the brand name manufacturer of Singulair, Defendants could have, at any time,

15 unilaterally updated the Singulair label without waiting for FDA preapproval in order to "add or

16 strengthen a contraindication, warning, precaution, or adverse reaction" under the "changes being

17 effected" regulation. 21 C.F.R. § 314.70(c)(6)(iii)(A). As the brand name manufacturer of Singulair,

18 a part of Defendants' business was to give information about Singulair to the public and medical

19 community upon which the safety of patients like Plaintiff, depend.

20     92.    Insurance is available to a brand name manufacturer, like Defendants, to insure

21 against liability arising from their failure to adequate warn of the risks associated with

22 Singulair/Montelukast that Defendants knew or reasonably should have known.

23 **TOLLING STATUTES OF LIMITATIONS**

24 **Discovery-Rule Tolling**

25     93.    Within the period of any applicable statute of limitations, Plaintiff could not have

26 discovered through the exercise of reasonable diligence that Singulair® caused a significantly

27 increased risk of adverse neuropsychiatric events.

28     94.    Plaintiff did not discover, and did not know of, facts that would have caused a

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

reasonable person to suspect that his injuries were caused by Defendants' concealment and suppression of the fact that individuals who ingested Singulair® were at significantly increased risk of developing neuropsychiatric events.

95.     Plaintiff could not have reasonably discovered the true extent of Defendants' deception or suppression about Singulair®'s safety until the FDA required the Boxed Warning about the serious mental health side effects for Singulair® and the advisement on the restriction of use of Singulair®.

96.     For these reasons, all applicable statutes of limitations have been tolled byoperation of the discovery rule.

**A. Estoppel**

97.     Defendants were under a continuous duty to adequately disclose to and inform Plaintiff of the risk of developing neuropsychiatric events with Singulair®.

98.     Defendants knowingly, affirmatively, and actively concealed, suppressed, ignored, or recklessly disregarded the true risks of developing neuropsychiatric events associated with Singulair® and never updated the drug's label to adequately disclose this risk.

99.     Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

**B. Continuing Tort**

100.    The continuing tort doctrine applies when  there is a repeated or continuous injury and the tort is not completed until the last injury is inflicted or the wrongdoing ceases. In cases of continuing torts, the statutes of limitations do not begin to run until the date of the last tortious act.

101.    Plaintiff used Singulair® over extended periods. Each time  Plaintiff ingested Singulair®, it constituted a continuing tort.

102.    The time period associated with Plaintiff's statute of limitations did not begin to run until, at the earliest, Plaintiff's last use of Singulair®.

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**STRICT LIABILITY - DESIGN DEFECT**

**(Against Merck Defendants and DOES 1-10, Inclusive)**

103.   Plaintiff incorporates by reference each preceding and succeeding paragraphs as though set forth fully at length herein.

104.   At all times relevant, Defendants tested, developed, designed, labeled, manufactured, marketed, sold, distributed, advertised, and promoted Singulair®.

105.   Singulair® is defective because it causes neuropsychiatric events.   The risk of neuropsychiatric events from Singulair® ingestion, including but not limited to (a) agitation, aggressive behavior, or hostility; (b) attention problems; (c) bad or vividdreams; (d) depression; (e) disorientation or confusion; (f) feeling anxious; (g) hallucinations (seeing or hearing things that are not really there); (h) irritability; (i) memory problems; (j) obsessive-compulsive symptoms; (k) restlessness; (l) somnambulance (sleepwalking); (m) stuttering; (n) suicidal thoughts (suicidality) and actions; (o) tremor or shakiness; (p) trouble sleeping; and (q) uncontrolled muscle movements (tics) were actually known to and foreseeableto Merk Defendants at all times during the period which they manufactured and sold Singulair®.

106.   The risks of neuropsychiatric injuries posed by Singulair® were reasonably foreseeable to Defendants.

107.   The Singulair® used by Plaintiff was defectively designed in that (1) its risks outweighed its utility, and (2) safer, feasible alternative designs are and were at all times available. These safer alternative designs include (a) modifying montelukast itself to make it less likely to pass the BBB, (b) modifying Singulair® without modifying montelukast to make it less likely that montelukast would pass the BBB, (c) modifying Singulair®'s dosing regimen to enable prescribers to prescribe the lowest therapeutic dose, (d) modifying Singulair®'s instructions to enable prescribers to prescribe the lowest therapeutic dose, and instruct patients to take Singulair® when it is less likely to cross the BBB.

108.   As further described above, the scientific community expressed concern about

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1  the propensity of montelukast to cause an increased risk of neuropsychiatric events when ingested.

2  From the time of Singulair®'s launch until the present day, various scientific literature, as further

3  discussed above, has expressed concerns about an increased risk of adverse neuropsychiatric events

4  in patients who ingest Singulair® (montelukast). Plaintiff was unaware of this scientific literature,

5  but Defendants were aware of it.

6       109.    The risk of Singulair® outweighs its benefits.

7       110.    Specifically, the benefit of Singulair® is, at best, the treatment and/or prevention of

8  asthma and hay fever symptoms.  This benefit is significantly outweighed by the risks posed by

9  Singulair®--the risk of permanent neuropsychiatric effects, and possibly even death.

10       111.    Plaintiff and Plaintiff's prescriber had many alternatives, including other leukotriene

11  receptor antagonists, inhaled corticosteroids, antihistamines, and a host of other pharmaceutical and

12  non-pharmaceutical options to Singulair®.  No reasonable consumer would select, from a slew of

13  equally effective, or possibly more effective products, the one that causes neuropsychiatric effects.

14       112.    Additionally or in the alternative, there are feasible alternative designs to Singulair®.

15       113.    Singulair® is and at all times was defective, unreasonably dangerous, and unsafe for

16  its intended purpose because, when ingested, it causes an increased risk of adverse neuropsychiatric

17  events.

18       114.    The risks of Singulair® causing neuropsychiatric injuries exist in part because

19  montelukast crosses the blood-brain-barrier.

20       115.    Defendants could have modified Singulair® in such a manner that it would not pass

21  the blood-brain-barrier unabated.

22       116.    They could have done this by changing the chemical montelukast itself.

23       117.    Defendants had options, like modifying montelukast to be less lipid-soluble or

24  modification of the hydrogen bonds to make passing the BBB more difficult.

25       118.    This alternative design is feasible.  Any of the three occasions when Merck

26  Defendants requested approval of a new NDA, they could have presented this alternative to FDA.

27       119.    Defendants also had options to modify Singulair® without modifying montelukast.

28       120.    For example, Defendants could have added a faster acting anti-inflammatory to make

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1    the BBB less permeable, or could have made an extended release tablet to decrease the amount of

2    montelukast assaulting the BBB at any one time.

3        121.    This alternative is feasible.  Many drugs include two otherwise approved active

4    ingredients, one of which is frequently anti-inflammatory.  Further, the capsules of approved drugs

5    are often designed for extended release.

6        122.    Additionally, the dosing regimen of Singulair® was defectively designed.

7        123.    Defendants could have created dosing options that would have allowed prescribers

8    to prescribe the lowest therapeutic dose, but did not do so.

9        124.    Singulair® is available in three "sizes": 4mg, 5mg, and 10mg.  In other words,

10   Merck's testing revealed that there is some significant difference in as small as one mg increments,

11   yet it did not provide a one mg option.  Even though Merck is aware of some significant difference

12   in adding just one mg to a patient's dose (as in increasing from 4mg to 5mg), Merck made it

13   impossible for a prescriber to increase a patient's dosage by just one mg in most circumstances.  For

14   example, if a prescriber wants to increase a dose from 5mg, the prescriber must double the dose to

15   10mg.

16       125.    Simply creating additional dosing options is a feasible alternative design, as

17   evidenced by the fact that Merck already created three doses.  There is no reason to believe a fourth

18   dosing option would be infeasible.

19       126.    Furthermore, the instructions to prescribers were designed deficiently.

20       127.    For example, Merck instructed prescribers to consider only a person's age when

21   determining dosage, disregarding entirely weight, stage of development, severity of symptoms, and

22   any other consideration.

23       128.    Instructing prescribers to consider severity of symptoms and weight is the norm.  It

24   is feasible for Singulair®'s dosing regimen to fit the norm.

25       129.    By way of another example, Merck also instructs prescribers to have patients ingest

26   Singulair® before bed, even though the BBB is more susceptible when a person is sleeping.

27       130.    Modifying instructions is feasible.

28       131.    Thus, at the time Singulair® left Defendants' control, there were practical,

25

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1   technically feasible, and safer alternative designs, that would have prevented the harm without

2   substantially impairing the reasonably anticipated or intended function of Defendants' medications

3   for asthma and allergic rhinitis.

4       132.    Defendants' omission of any alternative designs renders Singulair® not reasonably

5   safe.

6       133.    Singulair®'s design defects existed at the time Singulair® left Defendants'

7   possession and control.

8       134.    Singulair® reached the intended consumers, handlers, and users throughout the

9   United States, including Plaintiff, without substantial change in its condition as designed,

10  manufactured, sold, distributed, labeled, and marketed by Defendants.

11      135.    Plaintiff ingested Singulair® for an approved purpose and experienced

12  neuropsychiatric injuries as a result.

13      136.    Plaintiff ingested Singulair® without adequate knowledge of Singulair®'s

14  dangerous characteristics.

15      137.    At all times relevant, Plaintiff used Singulair® in an intended or reasonably

16  foreseeable manner without knowledge of Singulair®'s dangerous characteristics.

17      138.    Plaintiff could not have reasonably discovered the defects and risks associated with

18  Singulair® or montelukast-containing products before or at the time of ingestion and useas a result

19  of Defendants' suppression of, failure to obtain, or failure to provide scientific information linking

20  montelukast to neuropsychiatric events.

21      139.    The defects in Singulair® were substantial and contributing factors in causing

22  Plaintiff's injuries, harms, losses, and damages and, but for Defendants' misconduct and omissions,

23  Plaintiff would not have sustained injuries, harms, losses, and damages.

24      140.    Had Plaintiff known of the defects in Singulair®, Plaintiff would not have taken

25  Singulair®. Instead, Plaintiff would have taken a safer alternative to Singulair® that would not have

26  exposed Plaintiff to neuropsychiatric events.

27      141.    Plaintiff's injuries, harms, losses, and damages were directly and proximately caused

28  by Singulair® and Singulair®'s defect while Plaintiff purchased and used Singulair® in a

reasonably foreseeable manner for which recovery is sought.

142.    The benefits of Singulair®'s design are outweighed by the design's inherent risk of danger in causing neuropsychiatric events.

143.    Defendants knowingly designed Singulair® with the design defect that causes Singulair® to cause an increased risk of neuropsychiatric events when ingested to maximize profits.

144.    Defendants are therefore strictly liable for the damages caused to Plaintiff.

**SECOND CAUSE OF ACTION**

**STRICT LIABILITY - FAILURE TO WARN**

**(Against Merck Defendants, Organon and DOES 1-10, Inclusive)**

145.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

146.    "Defendants" in this cause of action refers to Merck while it held the NDA and if it did so, to Organon during the period it held the NDA.

147.    Defendants tested, developed, designed, labeled, manufactured, marketed, sold, distributed, advertised, and promoted Singulair® during the periods set forth above.

148.    At all times relevant, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain,  supply, provide proper warnings, and take such steps as necessary to ensure Singulair® did not cause users and consumers to suffer from unreasonable and dangerous risks.

149.    At all times relevant, Defendants had a continuing duty to warn Plaintiff and Plaintiff's prescribers of the dangers associated with Singulair® use.

150.    At all times relevant, Defendants could have provided adequate warnings or instructions regarding the full and complete risks of Singulair® and its active ingredient montelukast because Defendants knew or should have known of the unreasonable risks of harm associated with the use of Singulair® and montelukast. Such warnings could have been adequately disclosed in circumstances not limited to Singulair®'s labeling.

151.    At all times relevant, Defendants failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of Singulair® and to those who would

27

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1  foreseeably prescribe, use, or be harmed by Singulair®, including Plaintiff.

2      152.    Despite the fact that Defendants knew or should have known that Singulair® posed

3  a grave risk of harm, they failed to exercise reasonable care to warn of the dangerousrisks

4  associated with its use. The dangerous propensities of Singulair® and its active ingredient,

5  montelukast, as described above were either known to Defendants or scientifically knowable to

6  Defendants through appropriate research and testing by known methods at the time Defendants

7  distributed, supplied, or sold Singulair® and not adequately known to prescribing healthcare

8  providers and end users and consumers, such as Plaintiff.

9      153.    Defendants knew or should have known that Singulair® created significant risks of

10  serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn

11  prescribing healthcare providers and consumers, i.e., the reasonably foreseeable users, of the risks

12  of ingesting Singulair®. Upon information and belief, Defendants wrongfully concealed or

13  suppressed information concerning the dangerous nature of Singulair® and its active ingredient,

14  montelukast, and further made false and/or misleading statements concerning the safety of

15  Singulair® and montelukast.

16      154.    Singulair® is and at all times was defective and not reasonably fit, suitable, or safe

17  for its intended purpose because Defendants designed Singulair® in a defective manner and failed

18  to give adequate warnings or instructions at the time Singulair® left Defendants' control and after.

19      155.    Defendants failed to provide adequate warnings of the dangers regarding the factthat

20  Singulair® caused an increased risk of adverse neuropsychiatric events in individuals who ingested

21  Singulair®.

22      156.    Defendants failed to provide adequate warnings of the dangers regarding the factthat

23  Singulair® ingestion increased the risk suffering from neuropsychiatric events, including but not

24  limited to (a) agitation, aggressive behavior, or hostility; (b) attention problems; (c) bad or vivid

25  dreams; (d) depression; (e) disorientation or confusion; (f) feeling anxious; (g) hallucinations

26  (seeing or hearing things that are not really there); (h) irritability; (i) memory problems; (j)

27  obsessive-compulsive symptoms; (k) restlessness; (l) somnambulance (sleepwalking); (m)

28  stuttering; (n) suicidal thoughts (suicidality) and actions; (o) tremor or shakiness; (p) trouble

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1  sleeping; and (q) uncontrolled muscle movements (tics).

2      157.    Singulair®'s failure-to-warn defects existed at the time Singulair® left Defendants'

3  control.

4      158.    Defendants distributed Singulair® without sufficient warnings to notify Plaintiff's

5  prescriber or Plaintiff of the dangers inherent in ingesting Singulair®.

6      159.    Defendants knew or should have known that most physicians who prescribed

7  Singulair® did not know or fully appreciate the seriousness of the risks associated with Singulair®

8  or montelukast.

9      160.    Plaintiff ingested Singulair® for an approved purpose and experienced

10  neuropsychiatric events as a result of his Singulair® use.

11      161.    Defendants knew or should have known that the minimal warnings disseminated

12  with Singulair® were inadequate, failed to communicate adequate information on the dangers and

13  safe use of Singulair®, and failed to communicate warnings and instructions that were appropriate

14  and adequate to render the product safe for its ordinary, intended, and reasonably foreseeable uses.

15      162.    Had Plaintiff or Plaintiff's physician known of the defects in Singulair®, Plaintiff

16  would have been prescribed and would have ingested a safer alternative to Singulair® that would

17  not have exposed him to increased risks of suffering neuropsychiatric events.

18      163.    Plaintiff ingested Singulair® without knowledge of its dangerous characteristics.

19      164.    Plaintiff's injuries, harms, losses, and damages were directly and proximately caused

20  by Singulair®, including the lack, insufficiency, or adequacy of warning of Singulair®'s

21  unreasonable dangers as set forth above while Plaintiff used Singulair® in a reasonably foreseeable

22  manner for which recovery is sought.

23      165.    Defendants had a duty to properly warn Plaintiff and Plaintiff's physician of the risks

24  of Singulair® during the time when Plaintiff's prescriptions were being filled with Defendants'

25  Singulair®. Defendants' breach of this duty proximately caused the injuries described herein.

26      166.    Defendants' misrepresentations proximately caused Plaintiff's injuries.

27      167.    Defendants are therefore strictly liable for the damages caused to Plaintiff.

28      168.    Defendants' conduct, as described above, is also oppressive and malicious.

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1    Defendants regularly risked the health and lives of consumers and users of Singulair®, including

2    Plaintiff, with knowledge of Singulair®'s dangers. Defendants have made conscious decisions not

3    to voluntarily sell Singulair without re-design, re-labeling, adequately warning, or adequately informing

4    physicians and the public, including Plaintiff of the increased risk of developing neuropsychiatric

5    events when ingesting Singulair®. Defendants are guilty of oppression, in that their conscious

6    disregard for Plaintiff's rights subjected Plaintiff to cruel and unjust hardship of suffering

7    neuropsychiatric injury, as described above.  Further, Defendants are guilty of malice because their

8    despicable conduct was willful or done with conscious disregard of the rights and safety of

9    consumers, including Plaintiff.  Defendants' misconduct therefore warrants an award of exemplary

10   damages.

## THIRD CAUSE OF ACTION

## NEGLIGENCE

### (Against Merck Defendants, Organon and DOES 1-10, Inclusive)

14       169.   Plaintiff incorporates by reference each preceding and succeeding paragraph as

15   though set forth fully at length herein.

16       170.   "Defendants" in this cause of action refers to Merck while it held the NDA and if it

17   did so, to Organon during the period it held the NDA.

18       171.   At all times relevant, Defendants had a duty to exercise reasonable care in the

19   design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and

20   distribution of Singulair®, including the duty to take all reasonable steps necessary to manufacture,

21   promote, advertise, and/or sell a medication that was not unreasonably dangerous to consumers and

22   users of the medication.

23       172.   At all times relevant, Defendants had a duty to exercise reasonable care in the

24   marketing, advertisement, and sale of Singulair®. Defendants' duty of care owed to consumers and

25   the general public included providing accurate, true, and correct information concerning the risks of

26   using Singulair® and appropriate, complete, adequate, and accurate warnings concerning the

27   potential adverse effects of ingestion of Singulair® and its active ingredient, montelukast.

28       173.   At all times relevant, Defendants knew or, in the exercise of reasonable care, should

30

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1 have known of the hazards and dangers of Singulair® and specifically its increased risk of
2 neuropsychiatric events when ingested.

3     174.    Accordingly, at all times relevant, Defendants knew or, in the exercise of reasonable
4 care, should have known that use of Singulair® could cause or be associated with Plaintiff's injuries,
5 and thus, created a dangerous and unreasonable risk of injury to the users of Singulair®, including
6 Plaintiff.

7     175.    Defendants also knew or, in the exercise of reasonable care, should have known that
8 users and consumers of Singulair® and their prescribing physicians and healthcare providers were
9 unaware of or did not know or fully appreciate the seriousness and magnitude of the risks associated
10 with use of Singulair® and montelukast.

11     176.    Defendants breached their duty of reasonable care and failed to exercise ordinary
12 care in the design, research, development, manufacture, testing, marketing, supply, promotion,
13 advertisement, packaging, sale, and distribution of Singulair®  in that  Defendants manufactured
14 but and produced a medication containing montelukast, knew or had reason to know of the defects
15 inherent in Singulair® or had reason to know that a user's or consumer's ingestion of Singulair®
16 created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or
17 adequately warn of these risks and injuries.

18     177.    Defendants were negligent in their promotion of Singulair® by failing to adequately
19 disclose material risk information as part of their promotion and marketing of Singulair®, including
20 the internet, television, and print advertisements. Nothing preventedDefendants from being honest
21 in their promotional activities, and in fact, Defendants had a dutyto disclose the truth about the risks
22 associated with Singulair® in their promotional efforts outside of the of the context of labeling.

23     178.    Defendants had and have the ability and means to investigate, study, and test their
24 products and to provide adequate warnings, and Defendants failed to do so. Upon information and
25 belief, Defendants have wrongfully concealed information and have further made false and/or
26 misleading statements concerning the safety of Singulair® and montelukast.

27     179.    Defendants' negligence included:

28

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

a) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, advertising, and/or distributing Singulair® without thorough and adequate pre- and post-market testing;

b) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, advertising, and/or distributing Singulair® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of ingesting Singulair® and specifically its active ingredient, montelukast, and, consequently, the risk of serious harm associated with ingestion of Singulair®;

c) Failing to undertake sufficient studies and conduct necessary tests to determine whether Singulair® was safe for its intended use;

d) Failing to use reasonable and prudent care in the design, research, manufacture, and development of Singulair® so as to avoid the risk of serious harm associated with the ingestion of Singulair®;

e) Failing to design and manufacture Singulair® so as to ensure it was at least as safe and effective as other medications on the market treating the same and/or similar conditions;

f) Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would prescribe and use Singulair®;

g) Failing to adequately disclose to Plaintiff, Plaintiff, physicians, users/consumers, and the general public that use and ingestion of Singulair® presented severe risks of developing neuropsychiatric events;

h) Failing to adequately warn Plaintiff, Plaintiff, physicians, users/consumers, and the general public that Singulair®'s risk of harm was unreasonable and that there were safer and effective alternative medications available to Plaintiff, prescribing physicians,  and other consumers and Systematically suppressing or ignoring contrary evidence

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

about the risks, incidence, and prevalence of the side effects of Singulair® and montelukast- containing medications;

i) Representing that Singulair® was safe for its intended use when, in fact, Defendants knew or should have known that Singulair® was not safe or presented serious risks when used for its intended purpose;

j) Declining to make or propose any changes to Singulair®'s labeling or other promotional materials that would alert consumers, physicians, and the general public of the seriousness and magnitude of the risks of ingesting Singulair® and its active ingredient, montelukast;

k) Advertising, marketing, and recommending the use of Singulair® while concealing or failing to adequately disclose or warn of the dangers known by Defendants to be associated with or caused by the use of Singulair® and montelukast;

l) Continuing to disseminate information to consumers and physicians that indicates or implies that Singulair® is safe for use; and

m) Continuing the manufacture and sale of Singulair® with the knowledge that it was unreasonably unsafe and dangerous.

180.   Defendants knew and/or should have known that it was foreseeable that individuals such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary and reasonable care in the manufacturing, marketing, labeling, distribution, and sale of Singulair®.

181.   Plaintiff and Plaintiff's prescriber did not know  thenature and extent of the injuries that could result from the intended use of Singulair® or its active ingredient, montelukast. Absent Defendants' negligence, Plaintiff would not have developed neuropsychiatric events.

182.   As a direct and proximate result of Defendants placing Singulair® into  thestream of commerce, Plaintiff suffered injuries, harms, losses, and damages.

183.   Defendants are therefore liable for Plaintiff's damages arising from Defendants' negligence.

184.   Defendants' conduct, as described above, was not only negligent but it was also

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1  oppressive and malicious. Defendants regularly risked the health and lives of consumers and users

2  of Singulair®,including Plaintiff, with knowledge of Singulair®'s dangers. Defendants have made

3  conscious decisions not to voluntarily re-design, re-label, adequately warn, or adequately inform

4  physicians and the public, including Plaintiff of the increased risk of developing neuropsychiatric

5  events when ingesting Singulair®. Defendants are guilty of oppression, in that their conscious

6  disregard for Plaintiff's rights subjected Plaintiff to cruel and unjust hardship of suffering

7  neuropsychiatric injury, as described above. Further, Defendants are guilty of malice because their

8  despicable conduct was willful or done with conscious disregard of the rights and safety of

9  consumers, including Plaintiff. Defendants' misconduct therefore warrants an award of exemplary

10  damages.

11                          **FOURTH CAUSE OF ACTION**

12                          **NEGLIGENCE MISREPRESENTATION**

13               **(Against Merck Defendants, Organon and DOES 1-10, Inclusive)**

14          185.   Plaintiff incorporates by reference each preceding and succeeding paragraphs as

15  though set forth fully at length herein.

16          186.   "Defendants" in this cause of action refers to Merck while it held the NDA and if it

17  did so, to Organon during the period it held the NDA.

18          187.   At all relevant times, Defendants designed, manufactured, tested (or not), packaged,

19  labeled, marketed, advertised, promoted, supplied, distributed, sold, and/or otherwise placed

20  Singulair/montelukast into the stream of commerce, and therefore owed a duty of reasonable care

21  to avoid causing harm to those that consumed Singulair/montelukast, such as Plaintiff.

22          188.   Defendants were negligent, reckless, and careless and owed a duty to Plaintiff to

23  make accurate and truthful representations regarding Singulair/montelukast, Defendants breached

24  their duty, thereby causing Plaintiff to suffer harm.

25          189.   Defendants represented to Plaintiff, their physicians, and their prescriber via the

26  media, advertising, website, social media, packaging, and promotions, among other

27  misrepresentations described herein that Singular/montelukast was both safe and effective;

28  consumption of Singulair/montelukast would not result in neuropsychiatric side effects; and

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1 | Singulair/montelukast was safe for their intended use when, in fact, Defendants knew or should have
2 | known the product was not safe for its intended purpose.

3 |     190.    These representations were false. Because Singulair/montelukast crosses the blood-
4 | brain-barrier, it can and does cause negative neuropsychiatric events. The side effects were so
5 | significant that the FDA required a Black Box warning on Singulair.

6 |     191.    Defendants knew or should have known these representations were false and
7 | negligently made them without regard for their truth. Defendants had a duty to accurately provide
8 | this information to Plaintiff. In concealing this information from Plaintiff, Defendants breached their
9 | duty. Defendants also gained financially from and as a result of their breach.

10 |     192.    Defendants intended for Plaintiff, their physicians, and their prescriber to rely on
11 | these representations.

12 |     193.    Each of these misrepresentations were material at the time they were made. In
13 | particular, each of the misrepresentations concerned material facts that were essential to the analysis
14 | undertaken by Plaintiff as to whether to purchase or consume Singulair/montelukast.

15 |     194.    Plaintiff, their physicians, and their prescriber reasonably relied on these
16 | representations and were harmed as described herein. Plaintiff's reliance on Defendants'
17 | representation was a substantial factor in causing Plaintiff's harms. Had Defendants told Plaintiff
18 | the truth about the safety and composition of Singulair/montelukast, Plaintiff would not have
19 | consumed or purchased them.

20 |     195.    Defendants' acts and omissions as described herein were committed in reckless
21 | disregard of Plaintiff's rights, interests, and well-being to enrich Defendants.

22 |     196.    Plaintiff was injured as a direct and proximate result of Defendants' negligent
23 | misrepresentations regarding Singulair/montelukast as described herein. These injuries were, or
24 | should have been, reasonably foreseeable to Defendants.

25 |     197.    Defendants are therefore liable for Plaintiff's damages arising from Defendants'
26 | misrepresentations.

27 | **FIFTH CAUSE OF ACTION**
28 | **BREACH OF EXPRESS WARRANTY**

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

**(Against Merck Defendants, Organon and DOES 1-10, Inclusive)**

198.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

199.    "Defendants" in this cause of action refers to Merck while it held the NDA and if it did so, to Organon during the period it held the NDA.

200.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Singulair®, which is defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Singulair® into the stream of commerce.

201.    Defendants had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Singulair®, including a duty to:

        a.    ensure that its products did not cause the user unreasonably dangerous side effects;

        b.    adequately warn of dangerous and potentially fatal side effects; and,

        c.    adequately disclose adverse material facts, such as the true risks associated with the use of Singulair®, when making representations to consumers and the general public, including Plaintiff.

202.    The ability of Defendants to properly disclose those risks associated with Singulair® is not limited to representations made on the labeling.

203.    At all relevant times, Defendants expressly represented and warranted to the purchasers of their products, by and through statements made by Defendants in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Singulair® was safe to human health, effective, fit, and proper for its intended use. Defendants advertised, labeled, marketed, and promoted Singulair® representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Singulair® would conform to the representations.

204.    These express representations include incomplete or inadequate warnings and

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1   instructions that purport, but fail, to adequately include the complete array of risks associated with

2   use of Singulair®. Defendants knew and/or should have known that the risks expressly included in

3   Singulair® warnings and labels did not accurately or adequately set forth the risks of developing the

4   serious injuries complained of herein. Nevertheless, Defendants expressly represented that

5   Singulair® products were safe and effective, that they were safe and effective for use by individuals

6   such as Plaintiff, and/or that they were safe and effective as a medication.

7       205.    The representations about Singulair®, as set forth herein, contained or constituted

8   affirmations of fact or promises made by the seller to the buyer, which related to the goods and

9   became part of the basis of the bargain, creating an express warranty that the goods would conform to

10  the representations.

11      206.    Defendants placed Singulair® into the stream of commerce for sale and

12  recommended its use to consumers and the public without adequately warning of the true risks of

13  developing the injuries associated with the use of Singulair®.

14      207.    Defendants breached these warranties because, among other things, Singulair® was

15  defective, dangerous, and unfit for use, did not contain labels representing the true and adequate

16  nature of the risks associated with its use, and were not merchantable or safe for its intended,

17  ordinary, and foreseeable use and purpose. Specifically, Defendants breached the warranties in the

18  following ways:

19              i.      Defendants represented through their labeling, advertising, and

20  marketing materials that Singulair® was safe, and intentionally or negligently withheld and

21  concealed information about the risks of serious injury associated with use of Singulair® and by

22  expressly limiting or ignoring the risks associated with use within its warnings and labels; and

23              ii.     Defendants represented that Singulair® was safe for use and

24  intentionally or negligently concealed information that demonstrated that use of Singulair®

25  created an increased risk of developing and causing NSEs, and that Singulair®, therefore, was not

26  safer than alternatives available on the market.

27      208.    Plaintiff detrimentally relied on the express warranties and representations of

28  Defendants concerning the safety and/or risk profile of Singulair® in deciding to purchase and

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1   obtain the product. Plaintiff reasonably relied upon Defendants to accurately and adequately disclose

2   known defects, risks, dangers, and side effects of Singulair®. Plaintiff would not have purchased or

3   used Singulair® had Defendants properly disclosed the risks associated with the product, either

4   through advertising, labeling, or any other form of disclosure.

5        209.   Defendants had sole access to material facts concerning the nature of the risks

6   associated with Singulair®, as expressly stated within Singulair® warnings and labels, and knew

7   that consumers and users such as Plaintiff could not have reasonably discovered that the risks

8   expressly included in Singulair® warnings and labels were inadequate and inaccurate.

9        210.   Plaintiff had no knowledge of the falsity, incompleteness, or inadequacy of

10  Defendants' statements and representations concerning Singulair®.

11       211.   Plaintiff used Singulair® as researched, developed, designed, tested, manufactured,

12  inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the

13  stream of commerce by Defendants.

14       212.   Had the warnings, labels, advertisements, or promotional material for Singulair®

15  accurately and adequately set forth the true risks associated with the use of Singulair®, Plaintiff's

16  injuries, rather than expressly excluding such information and warranting that the product was safe

17  for its intended use, Plaintiff could have avoided the injuries, harms, losses, and damages

18  complained of herein.

19       213.   As a direct and proximate result of Defendants' breach of express warranty, Plaintiff

20  has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of

21  this Court.

22       214.   As a proximate result of Defendants' breach of express warranty, as alleged herein,

23  there was a measurable and significant interval of time during which Plaintiff suffered great mental

24  anguish and other personal injury harms, losses, and damages.

25       215.   As a proximate result of Defendants' breach of express warranty, as alleged herein,

26  Plaintiff sustained a loss of income and/or loss of earning capacity and/or other damages.

27       216.   Defendants are therefore liable for Plaintiff's damages arising from Defendants'

28  breach of warranty.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

### SIXTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY

### (Against Merck Defendants, Organon and DOES 1-10, Inclusive)

217.  Plaintiff incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

218.  "Defendants" in this cause of action refers to Merck while it held the NDA and if it did so, to Organon during the period it held the NDA.

219.  At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Singulair®, which was and is defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Singulair® into the stream of commerce.

220.  Before the time Plaintiff purchased Singulair®, Defendants impliedly warranted to its consumers, including Plaintiff, that Singulair® was of merchantable quality and safe and fit for the use for which it was intended; specifically, as a medication.

221.  Defendants failed to adequately disclose that Singulair® has dangerous propensities when used as intended and that use of Singulair® carries an increased risk of developing severe injuries, including Plaintiff's injuries.

222.  Plaintiff was one of the intended beneficiaries of the implied warranties made by Defendants to purchasers of Singulair®.

223.  Defendants expected Singulair® to reach, and Singulair® did in fact reach, consumers and users, including Plaintiff, without substantial change in the condition in which it was manufactured and sold by Defendants.

224.  At all relevant times, Defendants were aware that consumers and users of their products, including Plaintiff, would use Singulair® as marketed by Defendants, which is to say that Plaintiffs were foreseeable users and purchasers of Singulair®.

225.  Defendants intended that Singulair® be used in the manner in which Plaintiff, in fact, used it and which Defendants impliedly warranted to be of merchantable quality, safe, and fit for this use, even though Singulair® was not adequately tested or researched.

226.   In reliance upon Defendants' implied warranty, Plaintiff purchased and used Singulair® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendants.

227.   Plaintiff could not have reasonably or adequately discovered or known of the risks of serious injury associated with Singulair®.

228.   Defendants breached their implied warranty to Plaintiff in that Singulair® was not of merchantable quality, safe, or fit for its intended use, or adequately tested. Singulair® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

229.   The harm caused by Singulair® far outweighed its benefit, rendering the product more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

230.   As a direct and proximate result of Defendants' breach of implied warranty, Plaintiffs has sustained pecuniary loss and general damages in sums exceeding the jurisdictional minimum of this Court.

231.   As a proximate result of the Defendants' breach of implied warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs suffered great mental anguish and other personal injury and damages.

232.   As a proximate result of Defendants' breach of implied warranty, as alleged herein, Plaintiffs sustained a loss of income and/or loss of earning capacity and/or other damages.

233.   Defendants are therefore liable for Plaintiff's damages arising from Defendants' breach of warranty.

### RELIEF REQUESTED

WHEREFORE, PLAINTIFF prays for judgment against Defendants, and each of them, as follows:

1.   Past and future general damages, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at time of trial;

2.   Past and future economic and special damages according to proof at the time of trial;

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

3.      Loss of earnings and impaired earning capacity according to proof at the time of trial;

4.      Medical expenses, past and future, according to proof at the time of trial;

5.      Punitive or exemplary damages according to proof at the time of trial;

6.      Attorney's fees, as allowable by law;

7.      For costs of suit incurred herein;

8.      For pre-judgment interest as provided by law; and

9.      For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

BOUCHER LLP

DATED:  March 3, 2022

By:   _____
        SHEHNAZ M. BHUJWALA

        WILENTZ, GOLDMAN & SPITZER
        KEVIN P. RODDY

        BECK LAW CENTER
        KIMBERLY BECK

        Attorneys for Plaintiffs

41

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEMAND FOR JURY TRIAL**

PLAINTIFF hereby demands a trial by jury as to all claims and issues in this action that are so triable.

Respectfully submitted,

BOUCHER LLP

DATED:  March 3, 2022

By:  _____

SHEHNAZ M. BHUJWALA

WILENTZ, GOLDMAN & SPITZER
KEVIN P. RODDY

BECK LAW CENTER
KIMBERLY BECK

Attorneys for Plaintiffs

# SUPERIOR COURT OF CALIFORNIA,
## COUNTY OF VENTURA
### VENTURA



## MINUTE ORDER

DATE: 03/17/2022                    TIME: 11:35:00 AM        DEPT: 42

JUDICIAL OFFICER PRESIDING: Henry Walsh
CLERK: H McIntyre
REPORTER/ERM:

CASE NO: **56-2022-00563317-CU-PO-VTA**
CASE TITLE: **Obrien vs. MERCK Sharp & DOHME Corp**
CASE CATEGORY: Civil - Unlimited        CASE TYPE: PI/PD/WD - Other

---

**APPEARANCES**

---

Plaintiffs counsel has requested that this be designated as a complex case. It is essentially a two defendant product liability case. It is premature to determine whether or not it warrants complex designation. As such, that classification is not made at the present time. The case is referred to the case management department for further handling.

The Court notes that Ms. Kimberly Beck, a member of the Ohio Bar, is listed as counsel of record for Plaintiff *Pro Hac Vice*. That designation is likewise premature, and should not be used until Ms. Beck has been given that status.

The clerk is directed to give notice.

---

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF VENTURA**

Ventura
800  South Victoria Avenue
Ventura, CA 93009

**SHORT TITLE:** Obrien vs. MERCK Sharp & DOHME Corp

| CLERK'S CERTIFICATE OF SERVICE BY MAIL (Minute Order) | CASE NUMBER: 56-2022-00563317-CU-PO-VTA |
|---|---|

I certify that I am not a party to this cause. I certify that a true copy of the Minute Order was mailed following standard court practices in a sealed envelope with postage fully prepaid, addressed as indicated below. The mailing and this certification occurred at Ventura, California, on 03/18/2022.

Clerk of the Court, by: _____ , Deputy

SHEHNAZ  B BHUJWALA
21600  OXNARD STREET # 600
WOODLAND HILLS, CA 91367-4903

**CLERK'S CERTIFICATE OF SERVICE BY MAIL**

Page: 1

Code of Civil Procedure , § CCP1013(a)

CM-010

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*<br>Shehnaz M. Bhujwala (SBN 223484)<br>Boucher LLP, 21600 Oxnard St., Suite 600, Woodland Hills, CA  91367<br>TELEPHONE NO.: (818) 340-5400          FAX NO. *(Optional):* (818) 340-5401<br>E-MAIL ADDRESS: bhujwala@boucher.la<br>ATTORNEY FOR *(Name):* Plaintiff, Katherine O'Brien | **FOR COURT USE ONLY**<br><br>Electronically<br>**FILED**<br>by Superior Court of California<br>County of Ventura<br>03/04/2022<br>Brenda L. McCormick,<br>Executive Officer and Clerk<br><br>Jeanette Fimbres<br>Deputy Clerk |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Ventura
STREET ADDRESS:  800 South Victoria Avenue
MAILING ADDRESS:
CITY AND ZIP CODE: Ventura, CA 93009
BRANCH NAME: Hall of Justice

**CASE NAME:**
　O'Brien v. Merck & Co., Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [X] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | 56-2022-00563317-CU-PO-VTA |
| | | | | JUDGE: |
| | | | | DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| **Auto Tort** | **Contract** | **Provisionally Complex Civil Litigation** |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | **(Cal. Rules of Court, rules 3.400–3.403)** |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property** | [ ] Other collections (09) | [ ] Construction defect (10) |
| **Damage/Wrongful Death) Tort** | [ ] Insurance coverage (18) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Other contract (37) | [ ] Securities litigation (28) |
| [X] Product liability (24) | **Real Property** | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | [ ] Eminent domain/Inverse | [ ] Insurance coverage claims arising from the |
| [ ] Other PI/PD/WD (23) | condemnation (14) | above listed provisionally complex case |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | types (41) |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | **Enforcement of Judgment** |
| [ ] Civil rights (08) | **Unlawful Detainer** | [ ] Enforcement of judgment (20) |
| [ ] Defamation (13) | [ ] Commercial (31) | **Miscellaneous Civil Complaint** |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] RICO (27) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Professional negligence (25) | **Judicial Review** | **Miscellaneous Civil Petition** |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Partnership and corporate governance (21) |
| **Employment** | [ ] Petition re: arbitration award (11) | [ ] Other petition *(not specified above)* (43) |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [X] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [X] Large number of separately represented parties　　d. [X] Large number of witnesses
   b. [X] Extensive motion practice raising difficult or novel　e. [X] Coordination with related actions pending in one or more
   　　　issues that will be time-consuming to resolve　　　　　courts in other counties, states, or countries, or in a federal
   c. [X] Substantial amount of documentary evidence　　　　court
   　　　　　　　　　　　　　　　　　　　　　　　　　　f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [X] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [X] punitive
4. Number of causes of action *(specify):* Six
5. This case [ ] is  [X] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date:　March 3, 2022
　　Shehnaz M. Bhujwala　　　　　　　　　　　　▶　　　　　S/Bijwala
　　（TYPE OR PRINT NAME）　　　　　　　　　　　　　　　（SIGNATURE OF PARTY OR ATTORNEY FOR PARTY）

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev.September 1, 2021] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courts.ca.gov |

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

CASE #:56-2022-00563317-CU-PO-VTA RECEIPT #: 1220309D87076 DATE PAID : 03/9/22 3:29 PM TOTAL : 435.00 TYPE : EFT

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death·
Uninsured Motorist (46) *(if the
case involves an uninsured
motorist claim subject to
arbitration, check this item
instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability *(not asbestos or
toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) *(not civil
harassment)* (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract *(not unlawful detainer
or wrongful eviction)*
Contract/Warranty Breach–Seller
Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage *(not provisionally
complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent
domain, landlord/tenant, or
foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
drugs, check this item; otherwise,
report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
*(arising from provisionally complex
case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment *(non-
domestic relations)*
Sister State Judgment
Administrative Agency Award
*(not unpaid taxes)*
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-
harassment)*
Mechanics Lien
Other Commercial Complaint
Case *(non-tort/non-complex)*
Other Civil Complaint
*(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition *(not specified
above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition

For your protection and privacy, please press the Clear
This Form button after you have printed the form.

| Print this form | Save this form | Clear this form |

Ventura Superior Court Accepted through eDelivery submitted 03-04-2022 at 08:35:03 AM

CASE #:56-2022-00563317-CU-PO-VTA RECEIPT #: 1220309D87076 DATE PAID : 03/9/22 3:29 PM TOTAL : 435.00 TYPE : EFT

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF VENTURA

**800 South Victoria Avenue**
**Ventura , CA 93009**
**(805) 289-8525**
WWW.VENTURA.COURTS.CA.GOV

## NOTICE OF CASE ASSIGNMENT AND MANDATORY APPEARANCE

Case Number: **56-2022-00563317-CU-PO-VTA**

Your case has been assigned for all purposes to the judicial officer indicated below.

**A copy of this Notice of Case Assignment and Mandatory Appearance shall be served by the filing party on  all named Defendants/Respondents with the Complaint or Petition, and with any Cross-Complaint or Complaint in Intervention that names a new party to the underlying action.**

| ASSIGNED JUDICIAL OFFICER | COURT  LOCATION | DEPT/ROOM |
|---|---|---|
| Hon. Henry Walsh | Ventura | 42 |
| **HEARING** | | |
| EVENT DATE | EVENT TIME | EVENT DEPT/ROOM |
| | | |

## SCHEDULING INFORMATION

**Judicial Scheduling Information**

**APPEARANCE AT THE ABOVE HEARING IS MANDATORY.**
**Each party must file a Case Management Statement no later than 15 calendar days prior to the hearing and serve it on all parties.  If your Case Management Statement is untimely, it may NOT be considered by the court (CRC 3.725).**
**If proof of service and/or request for entry of default have not been filed:  At the above hearing you are ordered to show cause why you should not be compelled to pay sanctions and/or why your case should not be dismissed  (CCP 177.5, Local Rule 3.17).**

**Advance Jury Fee Requirement**
At least one party demanding a jury trial on each side of a civil case must pay a non-refundable jury fee of $150. The non-refundable jury fee must be paid timely pursuant to Code of Civil Procedure section 631.

**Noticed Motions/Ex Parte Matters**
To set an ex parte hearing, contact the judicial secretary in the assigned department.  Contact the clerk's office to reserve a date for a law and motion matter.

**Telephonic Appearance**
Telephonic appearance at the Case Management Conference is permitted pursuant to CRC 3.670.  In addition, see Local Rule 7.01 regarding notice to the teleconference provider.  The court, through the teleconference provider, will contact all parties and counsel prior to the hearing.

Date:  03/09/2022

Clerk of the Court,
By:_____
Jeanette Fimbres, Clerk

VEN-FNR082

**NOTICE OF CASE ASSIGNMENT AND MANDATORY APPEARANCE**

# EXHIBIT 2



## Secretary of State
## Statement of Information
(California Stock, Agricultural
Cooperative and Foreign Corporations)

**SI-550**

*111*

**FILED**
Secretary of State
State of California

**DEC 2 0 2021**

**IMPORTANT** — Read instructions before completing this

form. Fees (Filing plus Disclosure) – $25.00;

**Copy Fees** – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**1. Corporation Name** (Enter the **exact** name of the corporation as it is recorded with the California Secretary of State. Note: If you registered in California using an assumed name, see instructions.)

Merck Sharp & Dohme Corp.

*This Space For Office Use Only*

**2. 7-Digit Secretary of State Entity Number**

**C0200917**

**3. Business Addresses**

| a. Street Address of Principal Executive Office - Do not list a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 2000 Galloping Hill Road | Kenilworth | NJ | 07033 |
| b. Mailing Address of Corporation, if different than item 3a | City (no abbreviations) | State | Zip Code |
| | | | |
| c. Street Address of Principal **California** Office, if any and if different than Item 3a - Do not list a P.O. Box | City (no abbreviations) | State | Zip Code |
| | | CA | |

**4. Officers** — The Corporation is required to list all three of the officers set forth below. An additional title for the Chief Executive Officer and Chief Financial Officer may be added; however, the preprinted titles on this form must not be altered.

| a. Chief Executive Officer/ | First Name | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|---|
| Rita | | | Karachun | | |
| Address | | | City (no abbreviations) | State | Zip Code |
| 2000 Galloping Hill Road | | | Kenilworth | NJ | 07033 |
| b. Secretary | First Name | Middle Name | Last Name | | Suffix |
| Kelly | | | Grez | | |
| Address | | | City (no abbreviations) | State | Zip Code |
| 2000 Galloping Hill Road | | | Kenilworth | NJ | 07033 |
| c. Chief Financial Officer/ | First Name | Middle Name | Last Name | | Suffix |
| Jon | | | Filderman | | |
| Address | | | City (no abbreviations) | State | Zip Code |
| 2000 Galloping Hill Road | | | Kenilworth | NJ | 07033 |

**5. Director(s)** — California Stock and Agricultural Cooperative Corporations ONLY: Item 5a: At least one name **and** address must be listed. If the Corporation has additional directors, enter the name(s) and addresses on Form SI-550A (see instructions).

| a. First Name | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|
| Rita | | Karachun | | |
| Address | | City (no abbreviations) | State | Zip Code |
| 2000 Galloping Hill Road | | Kenilworth | NJ | 07033 |
| b. Number of Vacancies on the Board of Directors, if any | | | | |

**6. Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is **not** a corporation) | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|
| | | | | |
| b. Street Address (if agent is **not** a corporation) - **Do not enter a P.O. Box** | City (no abbreviations) | | State | Zip Code |
| | | | CA | |

**CORPORATION** – Complete Item 6c only. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b |
|---|
| C T Corporation        C0168406 |

**7. Type of Business**

| Describe the type of business or services of the Corporation |
|---|
| Pharmaceutical manufacturing |

**8. The Information contained herein, including in any attachments, is true and correct.**

| 12/13/2021 | Brian DiMaria | | | |
|---|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature | |
| | | Authorized Representative | | |

SI-550 (REV 12/2020)





2020 California Secretary of State
bizfile.sos.ca.gov

## Attachment to Statement of Information
(California Stock and Agricultural Cooperative Corporations)

**SI-550A Attachment**

**A. Corporation Name**

Merck Sharp & Dohme Corp.

**B. 7-Digit Secretary of State Entity Number**

C0200917

This Space For Office Use Only

**C. List of Additional Director(s)** – If the corporation has more than one director, enter the additional directors' names and addresses.

| First Name | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|
| 5b. Aaron | | Rosenberg | | |
| Address: 2000 Galloping Hill Road | City (no abbreviations): Kenilworth | | State: NJ | Zip Code: 07033 |
| 5c. Timothy | | Dillane | | |
| Address: 2000 Galloping Hill Road | City (no abbreviations): Kenilworth | | State: NJ | Zip Code: 07033 |
| 5d. Karen | | Ettelman | | |
| Address: 2000 Galloping Hill Road | City (no abbreviations): Kenilworth | | State: NJ | Zip Code: 07033 |
| 5e. Juanita | | Lee | | |
| Address: 2000 Galloping Hill Road | City (no abbreviations): Kenilworth | | State: NJ | Zip Code: 07033 |
| 5f. Jerome | | Mychalowych | | |
| Address: 2000 Galloping Hill Road | City (no abbreviations): Kenilworth | | State: NJ | Zip Code: 07033 |
| 5g. Michael | | Schwartz | | |
| Address: 2000 Galloping Hill Road | City (no abbreviations): Kenilworth | | State: NJ | Zip Code: 07033 |
| 5h. | | | | |
| Address: | City (no abbreviations): | | State: | Zip Code: |
| 5i. | | | | |
| Address: | City (no abbreviations): | | State: | Zip Code: |
| 5j. | | | | |
| Address: | City (no abbreviations): | | State: | Zip Code: |

SI-550A - Attachment (REV 12/2020)

Clear Form    Print Form

2/2

2020 California Secretary of State
bizfile.sos.ca.gov

# EXHIBIT 3

### STATE OF NEW JERSEY
### DEPARTMENT OF THE TREASURY
### DIVISION OF REVENUE AND ENTERPRISE SERVICES
### SHORT FORM STANDING

**MERCK & CO., INC.**
7954610000

*I, the Treasurer of the State of New Jersey, do hereby certify that the above-named New Jersey Domestic For-Profit Corporation was registered by this office on July 28, 1970.*

*As of the date of this certificate, said business continues as an active business in good standing in the State of New Jersey, and its Annual Reports are current.*

*I further certify that the registered agent and office are:*

C T CORPORATION SYSTEM
820 BEAR TAVERN ROAD
WEST TRENTON, NJ 08628



IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal at Trenton, this 7th day of March, 2022

*Elizabeth Maher Muoio*
*State Treasurer*

Certificate Number : 6129269226

Verify this certificate online at

https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

# EXHIBIT 4

```
Status Report For:    MERCK & CO., INC.
Report Date:          3/7/2022
Confirmation Number:  220662587838
```

## IDENTIFICATION NUMBER, ENTITY TYPE AND STATUS INFORMATION

```
Business ID Number:    7954610000
Business Type:         DOMESTIC PROFIT CORPORATION
Status:                ACTIVE
Original Filing Date:  07/28/1970
Stock Amount:          6520000000
Home Jurisdiction:     NJ
Status Change Date:    11-02-2009
```

## REVOCATION/SUSPENSION INFORMATION

```
DOR Suspension Start   N/A
Date:
DOR Suspension End     N/A
Date:
Tax Suspension Start   N/A
Date:
Tax Suspension End     N/A
Date:
```

## ANNUAL REPORT INFORMATION

```
Annual Report Month:   JULY
Last Annual Report     07/21/2021
Filed:
Year:                  2021
```

## AGENT/SERVICE OF PROCESS (SOP)INFORMATION

```
Agent:                 C T CORPORATION SYSTEM
Agent/SOP Address:     820 BEAR TAVERN ROAD ,WEST TRENTON,NJ,08628
Address Status:        DELIVERABLE
Main Business Address: 2000 GALLOPING HILL ROAD, KENILWORTH, NJ,
                       07033 1310
Principal Business     2000 GALLOPING HILL ROAD,KENILWORTH,NJ,07033
Address:               1310
```

## ASSOCIATED NAMES

```
Associated Name:       SCHERING-PLOUGH CORPORATION
Type:                  PV
```

## PRINCIPALS

Following are the most recently reported officers/directors (corporations), managers/members/managing members (LLCs), general partners (LPs), trustees/officers (non-profits).

| | |
|---|---|
| Title: | PRESIDENT |
| Name: | KARACHUN,RITA |
| Address: | 2000 GALLOPING HILL ROAD, KENILWORTH, , , US |
| Title: | SECRETARY |
| Name: | FILDERMAN,JON |
| Address: | 2000 GALLOPING HILL ROAD, KENILWORTH, , , US |
| Title: | TREASURER |
| Name: | LITCHFIELD,CAROLINE |
| Address: | 2000 GALLOPING HILL ROAD, KENILWORTH, , , US |
| Title: | OTHER |
| Name: | Grez,Kelly E |
| Address: | 2000 GALLOPING HILL ROAD, KENILWORTH, , , US |

## FILING HISTORY -- CORPORATIONS, LIMITED LIABILITY COMPANIES, LIMITED PARTNERSHIPS AND LIMITED LIABILITY PARTNERSHIPS

To order copies of any of the filings below, return to the service page, https://www.njportal.com/DOR/businessrecords/Default.aspx and follow the instructions for obtaining copies. Please note that trade names are filed initially with the County Clerk(s) and are not available through this service. Contact the Division for instructions on how to order Trade Mark documents.

Charter Documents for Corporations, LLCs, LPs and LLPs

| | |
|---|---|
| Original Filing (Certificate)Date: | 1970 |

Changes and Amendments to the Original Certificate:

| Filing Type | Year Filed |
|---|---|
| CHANGE OF REGISTERED OFFICE | 1984 |
| CHANGE OF REGISTERED OFFICE | 1984 |
| CHANGE OF REGISTERED AGENT | 2000 |
| CHANGE OF REGISTERED AGENT | 2001 |
| CHANGE OF REGISTERED AGENT | 2004 |
| CHANGE OF REGISTERED AGENT | 1994 |
| CORRECTION | 2004 |
| MERGER | 2009 |

| | |
|---|---|
| MERGER | 1987 |
| MERGER | 1990 |
| RESTATED | 2004 |
| RESTATED | 2007 |
| RESTATED | 2006 |
| RESTATED | 2007 |
| RESTATED | 2007 |
| RESTATED WITH NAME CHANGE | 2009 |
| CHANGE OF AGENT AND OFFICE | 2000 |
| CHANGE OF AGENT AND OFFICE | 2008 |
| CHANGE OF AGENT AND OFFICE | 1996 |
| AMENDMENT | 2004 |
| AMENDMENT | 2007 |
| AMENDMENT | 2007 |
| AMENDMENT | 2021 |
| AMENDMENT | 1971 |
| AMENDMENT | 1971 |
| AMENDMENT | 1973 |
| AMENDMENT | 1975 |
| AMENDMENT | 1979 |
| AMENDMENT | 1979 |
| AMENDMENT | 1984 |
| AMENDMENT | 1984 |
| AMENDMENT | 1985 |
| AMENDMENT | 1987 |
| AMENDMENT | 1989 |
| AMENDMENT | 1995 |
| AMENDMENT | 1997 |
| AMENDMENT | 1998 |
| AMENDMENT | 1997 |
| Annual Report Filing with address change | 2015 |
| Annual Report filing with officer/member change | 2015 |
| Annual Report filing with officer/member change | 2016 |
| Annual Report filing with officer/member change | 2017 |
| Annual Report filing with officer/member change | 2018 |
| Annual Report filing with officer/member change | 2019 |
| Annual Report filing with officer/member change | 2020 |
| Annual Report filing with officer/member change | 2021 |

Note:
Copies of some of the charter documents above, particularly those filed before June
1988 and recently filed documents (filed less than 20 work days from the current date),
may not be available for online download.

- For older filings, contact the Division for instructions on how to order.
- For recent filings, allow 20 work days from the estimated filing date, revisit the
  service center at https://www.njportal.com/DOR/businessrecords/Default.aspx
  periodically, search for the business again and build a current list of its
  filings. Repeat this procedure until the document shows on the list of documents
  available for download.


The Division cannot provide information on filing requests that are in process. Only
officially filed documents are available for download.

# EXHIBIT 5



# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "ORGANON & CO." IS DULY INCORPORATED
UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND
HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS
OFFICE SHOW, AS OF THE EIGHTH DAY OF MARCH, A.D. 2022.

Jeffrey W. Bullock, Secretary of State

7834229  8300

SR# 20220910198

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202857472

Date: 03-08-22

# EXHIBIT 6

### STATE OF NEW JERSEY
### DEPARTMENT OF THE TREASURY
### DIVISION OF REVENUE AND ENTERPRISE SERVICES
### SHORT FORM STANDING

#### ORGANON & CO.
0101057626

*I, the Treasurer of the State of New Jersey, do hereby certify that the above-named Delaware Foreign For-Profit Corporation was registered by this office on February 23, 2021.*

*As of the date of this certificate, said business continues as an active business in good standing in the State of New Jersey, and its Annual Reports are current.*

*I further certify that the registered agent and office are:*

C T CORPORATION SYSTEM
820 BEAR TAVERN ROAD
WEST TRENTON, NJ 08628



*IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal at Trenton, this 7th day of March, 2022*

*Elizabeth Maher Muoio*
*State Treasurer*

Certificate Number : 6129269156

Verify this certificate online at

https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

# EXHIBIT 7



# Delaware

### The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "ORGANON LLC" IS DULY FORMED UNDER THE
LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A
LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF
THE EIGHTH DAY OF MARCH, A.D. 2022.



Jeffrey W. Bullock, Secretary of State

7803284  8300

SR# 20220910323

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202858233

Date: 03-08-22

EXHIBIT 8

**STATE OF NEW JERSEY**
**DEPARTMENT OF THE TREASURY**
**DIVISION OF REVENUE AND ENTERPRISE SERVICES**
**SHORT FORM STANDING**

**ORGANON LLC**
0600467987

*I, the Treasurer of the State of New Jersey, do hereby certify that the above-named Delaware Foreign Limited Liability Company was registered by this office on May 13, 2020.*

*As of the date of this certificate, said business continues as an active business in good standing in the State of New Jersey, and its Annual Reports are current.*

*I further certify that the registered agent and office are:*

C T CORPORATION SYSTEM
820 BEAR TAVERN ROAD
WEST TRENTON, NJ 08628



IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal at Trenton, this 7th day of March, 2022

Elizabeth Maher Muoio
State Treasurer

Certificate Number : 6129269364

Verify this certificate online at

https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

# EXHIBIT 9

**Secretary of State**
**Statement of Information**
(Limited Liability Company)

**LLC-12**

21-C55432

# FILED

In the office of the Secretary of State
of the State of California

MAY 17, 2021

**This Space For Office Use Only**

**IMPORTANT — Read instructions before completing this form.**

**Filing Fee – $20.00**

**Copy Fees** – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**1. Limited Liability Company Name** (Enter the exact name of the LLC.  If you registered in California using an alternate name, see instructions.)

ORGANON LLC

| 2.  12-Digit Secretary of State File Number | 3.  State, Foreign Country or Place of Organization (only if formed outside of California) |
|---|---|
| 202017610765 | DELAWARE |

**4.  Business Addresses**

| a. Street Address of Principal Office - Do not list a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 30 Hudson Street, 33rd Floor | Jersey City | NJ | 07302 |

| b. Mailing Address of LLC, **if different than item 4a** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 30 Hudson Street, 33rd Floor | Jersey City | NJ | 07302 |

| c. Street Address of **California** Office, if Item 4a is not in California - Do not list a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | CA | |

**5.  Manager(s) or Member(s)**

If no **managers** have been appointed or elected, provide the name and address of each **member**. At least one name **and** address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank).  If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank).  Note:  The LLC cannot serve as its own manager or member.  If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (see instructions).

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Entity Name - Do not complete Item 5a |
|---|
| Organon & Co. |

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 30 Hudson Street, 33rd Floor | Jersey City | NJ | 07302 |

**6.  Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only.  Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is **not** a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Street Address (if agent is **not** a corporation) - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | CA | |

**CORPORATION** – Complete Item 6c only.  Only include the name of the registered agent.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b |
|---|
| C T CORPORATION SYSTEM (C0168406) |

**7.  Type of Business**

| a. Describe the type of business or services of the Limited Liability Company |
|---|
| wholesale drug and manufacturing company |

**8.  Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

**9.  The Information contained herein, including any attachments, is true and correct.**

| 05/17/2021 | Faye C Brown | Assistant Secretary | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed.  SEE INSTRUCTIONS BEFORE COMPLETING.)

Name:

Company:

Address:

City/State/Zip:

1

**PROOF OF SERVICE**

2

STATE OF CALIFORNIA        )
                                              )  ss.
3

COUNTY OF LOS ANGELES )

4

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is Venable LLP, 2049 Century Park East, Suite 2300, Los Angeles, California.

5

6

On April 15, 2022, I served a copy of the foregoing document(s) described as **DECLARATION OF NICOLE N. KING IN SUPPORT OF DEFENDANTS MERCK & CO., INC., MERCK SHARP & DOHME CORP., ORGANON & CO., AND ORGANON LLC'S (1) NOTICE OF REMOVAL AND REMOVAL OF ACTION AND (2) REQUEST FOR JUDICIAL NOTICE** on the interested parties in this action addressed as follows:

7

8

9

10

Kevin P. Roddy,                                    *Counsel for Plaintiff*
WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Drive, Suite 900
Woodbridge, New Jersey 07095
Tel: (732) 855-6402
Email: kroddy@wilentz.com

11

12

13

Kimberly Beck, Pro Hac Vice                  *Counsel for Plaintiff*
BECK LAW CENTER
201 E. 5th Street, Suite 1900
Cincinnati, Ohio
Tel: (888) 434-2912
Email: kim@becklawcenter.com

14

15

16

17

Shehnaz M. Bhujwala,                            *Counsel for Plaintiff*
BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367
Tel: (818) 340-5400
Fax: (818) 340-5401
Email: bhujwala@boucher.la

18

19

20

21

☑    By placing true copies thereof enclosed in a sealed envelope(s) addressed as stated above.

22

☑    **BY MAIL (FRCP 5(b)(2)(C))**:  I am readily familiar with the firm's practice of collection and processing correspondence for mailing with the U.S. Postal Service.  Under that practice such envelope(s) is deposited with the U.S. postal service on the same day this declaration was executed, with postage thereon fully prepaid at, in the ordinary course of business.

23

24

25

I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

26

27

Executed on **April 15, 2022**, at Los Angeles, California.

28

_____
                /s/ Samantha Jackson
                  Samantha Jackson